**UNITED STATES of America**

v.

**Jack W. GRIFFIN and Metro Management Corporation.**

**No. IP 75-82-CR.**

United States District Court,
S. D. Indiana,
Indianapolis Division.

Oct. 3, 1975.

John E. Hirschman, U. S. Atty., Thomas L. Bose, Asst. U. S. Atty., David H. Coffman, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff.

John M. Heeter, and F. Keith Leach, Indianapolis, Ind., for defendants.

## MEMORANDUM OPINION

NOLAND, District Judge.

This criminal proceeding was initiated upon the grand jury's return of a twenty-nine count indictment on April 28, 1975, against Metro Management Corporation (hereinafter MMC) and Jack W. Griffin. In general, Count I of the indictment charges that MMC, by and through its President, Jack W. Griffin, conspired with certain unindicted contractors to defraud the Department of Housing and Urban Development of the United States of America (hereinafter HUD) in violation of Title 18 United States Code, Section 371. Counts II through XXIX charge that the defendants, while acting for and on behalf of HUD as an area management broker, solicited and received various amounts of money from said unindicted contractors, in a specific amount charged in each count, in return for being unlawfully influenced in the performance of their official duties in violation of Title 18 United States Code, Section 201(c).

The issues were joined by a plea of not guilty to the charges contained in the indictment and, the defendants having waived their right to trial by jury, trial was held to the Court commencing September 16, 1975. Evidence was presented and testimony was given which have now been duly considered by the Court.

The Court now finds the defendants Jack W. Griffin and Metro Management Corporation guilty as charged in Counts I through XXVIII of the indictment as charged. The Government concedes that no proof was submitted as to Count XXIX and, therefore, the Court now dismisses Count XXIX of the indictment as to both defendants.

The indictment returned by the grand jury named as defendants both Metro Management Corporation and its President, Jack W. Griffin, in each count of the indictment. This opinion henceforth refers to Jack W. Griffin and Metro Management Corporation as the defendants. While MMC and Griffin, constitute two separate legal entities, the corporation acted only through Griffin, its principal officer and agent. Authority for finding both the corporation and its President guilty as charged is found in the case of *Continental Baking Company v. United States,* 281 F.2d 137 (6th Cir. 1960) where the court stated:

> "There is an officer or agent of a corporation with broad express authority, generally holding a position of some responsibility, who performs a criminal act related to the corporate principal's business. Under such circumstances, the courts have held that so long as the criminal act is directly related to the performance of the duties which the officer or agent has the broad authority to perform, the corporate principal is liable for the criminal act also, and must be deemed to have 'authorized' the criminal act." 281 F.2d at 149.

Therefore, Jack W. Griffin has been found guilty individually, and his ac-

tions in violation of the law were also the actions of the corporation. Because the acts of Griffin are imputed to the corporation, the following opinion may refer to "the defendants" or to either of the two defendants separately.

The evidence disclosed the following to be the facts and circumstances of the events and transactions which form the basis of the indictment of the defendants herein.

Area management broker contracts are awarded based on a bidding procedure among qualified real estate brokers in a given area. A contracting officer for HUD awards the area contract to the lowest bidder qualifying under HUD standards. The general functions of the area management broker include providing security and protection for repossessed, foreclosed, or abandoned properties under the control of HUD, inspecting such properties and preparing specifications for their repair and rehabilitation so to return them to marketable condition, preparing estimates for the cost of such repairs, and soliciting and receiving bids from qualified local contractors for the repair of such properties on bid forms supplied by the area management broker. At least three bids must be received on each contract and the bidding procedure is to be competitive among the contractors, i. e., the bids are to be kept secret until they are all open. While the area broker has some discretion as to which contractors he forwards bid forms, it is recommended that the forms be distributed on a more or less rotational basis, and no contractor is supposed to be working on more than five jobs at the same time under a local HUD office regulation. Additionally, Article 15 of an area broker's contract prohibits the area broker from receiving any gratuity or compensation from the contractors and no contractor is to have a competitive advantage in the bidding procedure (Ex. #2c, pg. 6). The area management broker then submits the three lowest bids to HUD with a recommendation that the lowest bidder be awarded the contract for the particular job. The practice is that the lowest bidder is usually awarded the contract if he has qualified under HUD standards and the bid is not more than 10% in excess of the initial estimate submitted by the area broker. While the work is in progress, the area broker has the option of inspecting the property, but he must do so upon completion of the project. The area broker then forwards the necessary forms signed by him and the contractor (Form 2542) to HUD where a certifying officer authorizes payment to the contractor out of HUD funds. The area broker is to receive payment from HUD for his services in connection with each property, although there was an allegation that the defendant herein did not actually receive payment in all cases. Additional testimony described other indirect benefits of being an area management broker, such as the knowledge of new available housing in his area and the time when such property will be on the market.

The evidence presented to the court demonstrated a scheme established and administered by defendant Griffin requiring a 10% payment to Griffin by contractors out of the revenue they received on HUD jobs in return for the defendant's favoritism in the awarding of the contracts on such jobs. Clearly this arrangement of a 10% fee constituted an illegal kickback and was contrary to 18 U.S.C. § 201, the relevant portions of which are as follows:

§ 201. Bribery of public officials and witnesses.

(a) For the purpose of this section: "public official" means . . . , or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government or a juror; and . . .

"official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit.

\* \* \* \* \* \*

(c) Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any person or entity, in return for:

(1) being influenced in his performance of any official act; or

(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) being induced to do or omit to do any act in violation of his official duty; . . . shall be fined not more than $20,000 . . ."

In addition, the Court concludes the planning, establishing, and administering of this arrangement clearly constituted a conspiracy against the United States in violation of 18 U.S.C. § 371, which provides as follows:

§ 371. "Conspiracy to commit offense or to defraud United States.

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . ."

Although only defendants Griffin and MMC were indicted, the conspiracy was accomplished as alleged by virtue of the cooperation of unindicted co-conspirators Clyde Millhorn, Marion Caughey, Michael Brady, William E. Bruce, Clyde Riggleman, Joseph Zupan, Robert Bilyeu, Steven Dunbar, Junior Perkins, Hubert Robinson, Henry Huber, John Costello and Phillip Ajamie. The conspiracy consisted of the joint action of the conspirators in the rigging of bids through the use of courtesy bids and fictitious business concerns. It is clear that a corporation may be found guilty of a criminal conspiracy under 18 U.S.C. § 371. See, *Mininsohn v. United States,* 101 F.2d 477 (3rd Cir. 1939) and 19 C. J.S. Corporations § 1364a, p. 1076–1077.

The evidence disclosed that defendant MMC was awarded an area management broker contract for a segment of Marion County, Indiana under Contract #073111 (Ex. #2, 2a, 2b and 2c) commencing September 1, 1967. As to Count I, evidence was presented that as early as late 1967 defendant Griffin, acting on behalf of MMC, was soliciting and receiving payments from local contractors in return for favors in the awarding of contracts for the repair of HUD properties in his area. Contractor Samuel Pierson testified that in late 1967, he had a meeting with defendant Griffin at the defendant's office in Indianapolis, Indiana, whereat the defendant informed Pierson he would be certain to be awarded contracts to repair various HUD properties if he shared 50% of his profit on each job with the defendant. Pierson testified that he was awarded the contract for the repair of certain property through the defendants and that in December 1967 he wrote a check to "Delaware Investment Co." in the sum of $215.00 to pay Griffin his one-half share of the profit on the job. This check was returned for insufficient funds (Ex. 49a), so on January 24, 1968, Pierson paid Griffin the sum of $215.00 cash to replace the check. Griffin then issued Pierson a receipt for such payment (Ex. 49). Pierson testified that in April 1970, he and Griffin modified their agreement so that Griffin would be paid 10% of the contract price on jobs awarded to Pierson through MMC. Pierson testified that he made these 10% payments to Griffin on approxi-

mately 80% of the HUD jobs he received through MMC in the total amount of at least $8,215.00. He stated the payments were personally made by himself to Griffin in cash at Griffin's office in Indianapolis, Indiana. (See Exs. 49 through 53).

Witness Robert Henniger testified that he talked with Griffin at the defendant's office in October 1967, at which time he was told that he could get work on HUD properties if he paid 10% of the contract price to Griffin upon being paid by HUD. Henniger stated that he was awarded two jobs of those he bid through the defendants but that he failed to make the 10% payment to Griffin in either case. He testified he thereafter stopped receiving bid forms on HUD jobs from the defendant.

Contractor Clyde Riggleman also testified that a short time after the defendants became an area broker, Griffin promised him that he would be in line to work on HUD properties if he paid the defendant 10% of the contract price on each job received. Riggleman testified that he made such payments to Griffin approximately 75% of the time, including on Order #7767 (Ex. 12), and that if he missed making the payments or was late in making them, inspections on completed work slowed down and he was sent bid forms on the less desirable job sites.

■ Contractor William Bruce testified that he had worked on HUD properties through Griffin since the fall of 1967. Bruce stated that he made the 10% payments to Griffin on approximately 85% of the jobs secured through the defendants and that the payments were made in cash around the time Bruce himself received his check from HUD. Bruce testified that whenever he got behind on his payments the defendant would remind him that he was behind in his "dues". The witness also described a program of "courtesy bidding" whereby contractors would be told by the defendant that they were to make high bids so that another contractor

would be assured of being awarded the contract. Bruce testified that he made approximately 100 of such courtesy bids at the direction of Griffin, and contractors Pierson, Costello, Dunbar, Caughey and Huber also testified they made courtesy bids on various jobs at the direction of the defendant. Exhibits were admitted into evidence demonstrating courtesy bids submitted by the various contractors (See e. g., Ex. 43 upon which bid form Contractor Costello wrote "courtesy"). While there was testimony that courtesy bids were sometimes used to facilitate quick repair of certain properties, the Court concludes that the courtesy bid program allowed the defendant to exercise improper influence and control over the solicitation of competitive bids and the awarding of the contracts.

Testimony was also heard concerning the making of bids by contractors in names other than their own. Contractors Millhorn, Dunbar, Bruce, Caughey, Huber, Costello and Pierson all testified that at the suggestion of Griffin they submitted bids in names other than the one in which they normally did business. This was done so as to by-pass a rule of the local HUD office limiting to five the number of HUD contracts any contractor could be working on at any given time. As an example, contractor Costello testified that he kept a record of those bids he made in names other than his own by keeping a copy of the bid form. (See e. g., Ex. 44a for bid form submitted by Costello under the name of Timothy Akin). Contractors Caughey and Costello also testified that on occasion they each received from the defendant all three sets of bid forms for a particular job with the understanding that they were to submit all three bids on the job, (two of which under names other than their own). Caughey testified that from time to time he would call Griffin or his secretary to find out whether his bids were going to be too high (i. e. in excess of another bid or more than 10% in excess of Griffin's original estimate). Costello testified

that when he would receive three sets of bid forms from the defendant, he would determine under which name the job was to be awarded and he would bid the other two as "courtesies" (See e. g. Exs. 46–48).

Contractor Bruce and witness Richard Teeters testified that shortly after Teeters was awarded the area broker contract for another segment of Marion County, Indiana in late 1969, Griffin met with them at the Milano Inn in Indianapolis, Indiana, at which time the defendant explained to Teeters the proper way to establish and administrate a program such as the defendant had instituted in his area. The defendant explained at that meeting how he administered his receiving of the 10% payments and stated that the most important thing was the cooperation of the contractors.

In summary, contractors Pierson, Riggleman, Ajamie, Huber, Bilyeu, and Bruce testified that they had explicit agreements with the defendant to make kickback payments in the amount of 10% of the contract price to the defendant in return for his influence and assistance in providing them with a steady flow of the best HUD jobs. Contractors Millhorn, Zupan, Perkins, Dunbar and Caughey testified that they also made the 10% kickbacks to the defendant under more of an implied arrangement. The evidence was clear that if a contractor fell behind in making the payments then the defendant would inquire of him about not receiving his "dues", inspections of jobs already completed slowed down, and the number of bid forms received from the defendant slowed down as well. Contractor Caughey testified that on one occasion the defendant told him that he was behind in his dues and that if Caughey did not stay current, the defendant could not pay his (Griffin's) dues.

Contractor Henry Huber testified that on many occasions he would call defendant Griffin on the phone about the status of certain jobs. He stated the defendant would then inform him of the bids on the locations and tell him to go under a certain figure if he wanted the job and over if he did not. Huber testified he was awarded the contract on those jobs in which he bid under the figure quoted to him by the defendant.

■ The Court concludes that as to Count I the evidence was overwhelming that Griffin conspired with known local contractors to defraud HUD by administering a program of soliciting and receiving illegal kickbacks from those contractors in return for using his position to unlawfully influence the legitimate function and purpose of the competitive bidding system intended to provide for the proper rehabilitation of HUD-owned properties. The Court believes that the entire program of kickbacks and bid rigging administered by Griffin amounted to a conspiracy to defraud the United States and a violation of Title 18, § 371. Defendants Jack W. Griffin and Metro Management Corporation are therefore found guilty beyond a reasonable doubt as to Count I of the indictment.

■ The Court concludes that the evidence presented by the Government clearly supports a finding of guilty beyond a reasonable doubt as to each defendant on each of substantive Counts II through XXVIII.

As to Counts II through VI, Contractor Clyde Millhorn testified that in 1970 he was desiring to get more work on HUD properties so he talked to defendant Griffin about getting into the "program". The witness testified between November 1970, and December 1971, he paid the defendant the sum of 10% of the contract price on each HUD job received from MMC. The payments were made to Griffin in cash at the defendant's office after Millhorn received his check from HUD. To generate the cash for such payments, Millhorn stated he made checks out to a fictitious sub-contractor by the name of Joseph George in the amount of 10% payment and then endorsed the name of the payee on the back of the check himself. The initials of Griffin's name were used so Millhorn

could keep track of which area broker the funds went to. Admitted into evidence were the purchase orders on jobs awarded to Millhorn and the checks to Joseph George by which he generated the cash to make the payments to Griffin on each particular job. Each check identifies the location of the job and the dates correspond to the dates charged in each count of the indictment. (See Exs. 3, 4, 5, 6 and 7).

In regard to Counts VII through X, Marion Caughey testified that he made 10% cash payments to the defendant on all HUD jobs secured through MMC between the summer of 1969 and 1972, although the kickback on the first of such jobs was made to the defendant through William Bruce. He stated that he normally paid the defendant upon receipt of his HUD check. Introduced into evidence were purchase orders and HUD checks for some of the jobs upon which Caughey testified he made the 10% kickbacks to the defendant. The dates on each check correspond to the date charged in each count of the indictment. (See Exs. 8a, 9a, 10a and 11a).

As to Counts XI through XV, Steven Dunbar testified that he first talked to the defendant in January 1971, and that he paid the defendant 10% of the contract price on every job he received through MMC. On a few occasions the defendant questioned Dunbar about payments which Dunbar felt he had already paid so he started keeping complete records of the payments. Dunbar stated he normally paid the defendant in cash at the defendant's office after cashing his own check from HUD. Introduced into evidence were purchase orders for some of the jobs upon which the witness made the kickback to the defendant. Some of the copies of the orders which a contractor would receive with his check demonstrate a marking by Dunbar such as "Paid Jack" (Ex. 19) indicating that he had made the payment on that particular job. The amounts of the purchase orders contained in Exhibits 16, 17, 18, 19 and 20 correspond to the payments charged in each of Counts XI through XV of the indictment.

As to Counts XVI through XIX, contractor Junior Perkins testified that he paid the 10% kickback to the defendant on all HUD jobs secured through MMC. Perkins stated all payments were made in cash to the defendant at the defendant's office. Admitted into evidence were the purchase orders and checks received by Perkins on four of the jobs in which he made the 10% payment to the defendant. (See Exs. 54–57). The amounts of such jobs correspond to the amounts charged in each of the said Counts XVI through XIX of the indictment.

In regard to Counts XX through XXIV, contractor Hubert C. Robinson testified that he was told by Steven Dunbar that he could get work on HUD houses if he paid 10% of the contract price on each job to the defendant. Robinson worked on HUD houses during 1971 and 1972 and made payments in the total sum of approximately $1,000 in cash to the defendant at his office on all jobs secured through MMC. Admitted into evidence were purchase orders for jobs secured through MMC on which Robinson said he made the 10% kickback to the defendant. The dates and amounts on said purchase orders correspond to those of each count of the indictment. (See Exs. 30, 31, 33, 34 and 35).

As to Counts XXV through XXVIII, contractor Phillip Ajamie testified that he was awarded HUD jobs through MMC from December 1968 through 1971. Ajamie said he paid the 10% kickback to the defendant on all jobs secured through MMC after Griffin told him he could get more HUD work if he made the payments to Griffin. Admitted into evidence were purchase orders for jobs secured through MMC on which Ajamie said he made the 10% kickback to the defendant in cash at the defendant's office. The dates and amounts on said purchase orders correspond to those of each count of the indictment. (See

Exs. 25, 26, 27 and 28). As to Count XXIX of the indictment, the Government concedes that it did not present any evidence as to such charge and, therefore, such count should be and is hereby dismissed as to each defendant.

 The defendants contend in their motion for judgment of acquittal under Rule 29 that at the time of the alleged offenses they were not "a person acting for or on behalf of the United States" and therefore cannot be found guilty of Title 18, United States Code, § 201. The defendants point to the fact that in acting as an area management broker they were an independent contractor and exercised no final judgment as to the awarding of jobs or paying of contractors for those jobs. While this Court agrees that an area broker operates as an independent contractor and, as such, exercises no final judgment in said matters, the Court does not believe this precludes him from qualifying as a person acting for or on behalf of the United States under 18 U.S.C. § 201. HUD empowered the defendants to conduct a competitive bidding system in connection with the solicitation and awarding of bids for the repair of HUD houses in the MMC area and Griffin's estimates of the cost of needed repairs served as one basis for the final awarding of contracts by HUD. While the low bidder among those from which the area broker solicited bids was not guaranteed of being awarded the contract by HUD, testimony was presented that such low bidder was in fact awarded the job at least 95% of the time. Thus, the Court feels that the defendants were placed in a position of responsibility and were enabled to exercise discretion to act for and on behalf of HUD in operating the system to provide for the rehabilitation of HUD properties. The mere fact that defendant Jack Griffin, as President of MMC, is an employee of the corporation and not of the United States does not prevent him from acting as a "public official" as defined in 18 U.S.C. § 201(a). The purpose of the statute is to protect the public from the evil consequences of corruption in the public service. *Kemler v. United States*, 133 F.2d 235 (1st Cir. 1942). The defendants have not pointed out to the Court any authority holding that an employee of a private corporation cannot qualify as a public official under this statute. This Court concludes that both defendants herein were acting for and on behalf of the United States for purposes of 18 U.S.C. § 201.

 The defendants also contend that since MMC did not actually come into legal existence until November 13, 1967, and it was awarded the area broker contract for the period commencing September 1, 1967, the contract is invalid and MMC cannot be found guilty of a violation of this statute. The Court does not agree. MMC conducted its affairs as if its contract with HUD was legally sufficient and binding and it is now estopped from asserting that its contract was invalid and thereby escape liability for its conduct.

In conclusion, as to Counts II through XXVIII, the evidence was overwhelming that defendant Jack W. Griffin, while acting in his official capacity as an area management broker for HUD, solicited and received payments of money from local contractors in return for (1) being influenced in the performance of his official acts; (2) being influenced to commit fraud on the United States; and (3) being induced to act in violation of his official duties. Such conduct was in violation of 18 U.S.C. § 201(c). Therefore, the Court finds the defendants Jack W. Griffin and Metro Management Corporation guilty beyond a reasonable doubt as to Counts II through XXVIII of the indictment.

Findings of fact and conclusions of law have not been separately stated but are included in the body of the foregoing opinion as specifically authorized by Rule 23(c) of the Federal Rules of Criminal Procedure.

Judgment is now entered in accordance with this opinion.