**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jerry MOSLEY, Defendant-Appellant.**

**No. 81–1183.**

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1981.

Decided Sept. 22, 1981.

Steven P. Handler and Paul Cottrell, Chicago, Ill., for defendant-appellant.

Michael Wise, Asst. U. S. Atty., Chicago, Ill., Robert Walter Farun, U. S. Atty., Dept. of Justice, Chicago, Ill., of counsel, for plaintiff-appellee.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and EAST *, Senior District Judge.

PELL, Circuit Judge.

Appellant Jerry Mosley was found guilty by a jury of violating 18 U.S.C. § 201(g) and

18 U.S.C. § 665(b) by soliciting through threats and receiving money in exchange for giving preferential treatment to certain individuals seeking jobs under the Comprehensive Employment and Training Programs Act, 29 U.S.C. § 801, *et seq.* (CETA). Mosley was employed in Chicago, Illinois as a CETA Intake and Eligibility Officer by the State of Illinois Bureau of Employment Security (IBES) which acted as the "prime sponsor" of the Chicago CETA program.[1] Mosley's CETA job title was Employment Section Manpower Representative II, and his duties were to interview applicants for CETA jobs, evaluate their CETA eligibility, and, if appropriate, refer them to employers offering CETA-funded jobs. The cost of the jobs as well as all of IBES' costs, including Mosley's salary, was paid for entirely by the Federal Government under the CETA program.

On March 29, 1979, Mosley interviewed CETA applicant Anthony S. Thomas in the IBES office. At that time, Mosley told Thomas that Thomas "could get the job quicker" if he paid Mosley $50. Consequently, Thomas gave Mosley the $50 and received a referral card for a CETA job for which Thomas was subsequently hired.

A similar occurrence happened on May 22, 1979, when Mosley interviewed Jerry Campbell for another CETA position. Mosley told Campbell there was a "long list of people waiting for jobs," and "you know how much it costs." Campbell responded that he lacked $50 but gave Mosley $20 in return for the referral card and stated that he owed Mosley $30. Campbell also received the CETA job to which Mosley had referred him.

At his trial, Mosley testified on his own behalf, denying that he accepted any money from CETA applicants or had promised them preferential treatment. On this ap-

* Senior Judge William J. East of the District of Oregon is sitting by designation.

1. The City of Chicago was the actual "Prime Sponsor" of its CETA program. However, through a contract between the City and the United States Department of Labor on August

30, 1977, IBES was substituted for the City to perform intake, assessment and referral services. In a "Non-Financial Agreement" between the City and IBES, IBES acknowledged its responsibility to administer the CETA program in the City.

peal, however, Mosley raises two different contentions. First, he claims that he was not a "public official" as that term is defined in 18 U.S.C. § 201(a) and utilized in § 201(g); and second, he contends that although he promised and gave Thomas and Campbell preferential treatment in exchange for the payments, he never utilized "threats or refusal of employment" prohibited by 18 U.S.C. § 665(b).

## I

Section 201(g) of Title 18, U.S.C. prohibits as a felony any "public official" from directly or indirectly asking, demanding, soliciting, accepting or receiving anything of value for himself for or because of any official act performed or to be performed by him. Section 201(a) defines "public official" as including any officer or employee of the federal Government or person "acting for or on behalf of the United States or any department, agency or branch of Government thereof." In this case, Mosley claims that because he and his superiors were state, and not federal, employees in that only the state government had the authority to hire or fire them, he cannot be considered a "public official" for the purposes of § 201(g).

Mosley places primary reliance in this argument on two Second Circuit cases, *United States v. Loschiavo*, 531 F.2d 659 (2d Cir. 1976), and *United States v. Del Toro*, 513 F.2d 656 (2d Cir. 1975), cert. denied, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42. These cases held that employees of the City of New York were not "public officials" for the purposes of § 201(g) in their employment under the federal Government "Model Cities" programs. In both cases, the district court had held that because 80% of the employees' salaries, and 100% of the Program's costs were underwritten by the federal Government, the employees were "public officials" subject to § 201(g). The Second Circuit rejected this narrow ap-

proach, noting in *Loschiavo* that it is not the degree of the Federal Government's payment of the specific program's costs that was important, but that it is "the character and attributes of [the employee's] employment relationship, if any, with the federal Government" which holds the greatest significance. 531 F.2d at 661. Because the employees were entirely under state supervision and authority pursuant to the Model Cities program, the court held that they were not "public officials" under § 201(g).

■■■ *Loschiavo* and *Del Toro* each concern the relationship between the federal Government and employees under an entirely separate statutory program than that which we review in this case, and thus neither of these cases directly controls the resolution of the issues presented here. Mosley nevertheless relies upon them as analogous to the present litigation. We cannot agree. Without reviewing in detail the statutory provisions and legislative history of the Model Cities program, we find that the provisions of and history underlying the CETA program manifest a substantial amount of federal Government involvement, a degree of involvement sufficient to warrant the district court's finding in this case that Mosley was indeed a "public official" "acting for or on behalf of the United States" Department of Labor.[2]

The statutory provisions of CETA clearly set forth substantial federal Government supervision of the local "prime sponsors" in charge of the local administration of the CETA programs and funds. Initially, § 811 sets forth the qualifications of a "prime sponsor," which includes the required submission of a "comprehensive plan" that must be approved by the Secretary of Labor prior to funding, § 813. The plan must include, *inter alia*, "a detailed description of the record keeping procedures ... which will allow the Secretary to audit and moni-

---

2. The only case of which we are aware involving the public official issue in the CETA context is a district court case in the Northern District of Illinois, *United States v. Hoskins*, 520 F.Supp. 410 (N.D.Ill.1981), holding con-

trary to the result we here reach. We, of course, do not regard the decision as binding authority in this court, nor do we regard the decision as having been correctly reached.

tor the prime sponsor's programs ...," § 813(a)(11), and "adequate assurances of compliance with all provisions of this chapter and regulations promulgated thereto." § 813(a)(21). In addition, annual plans are required which, *inter alia*, relate the prime sponsor's performance and placement goals to the Secretary's performance standards, § 813(b)(4), and contain budget and expenditure information, § 813(b)(5). The Secretary, upon review of the plans for compliance with the requirements of the statute and the applicable regulations, may order any necessary alteration in the plans, § 814(c)(1), or may disapprove of the plan entirely after a reasonable time for cure has expired. § 814(d)(1). Whenever the Secretary discovers a noncompliance with the statute, or regulations he may revoke all or part of the financial assistance after a hearing, § 816(c)(2), and "order such sanctions or corrective actions as are appropriate...." § 816(d)(1).

Section 828 provides the Secretary's power to "prescribe such rules and regulations, including performance standards, as deemed necessary ..." and pursuant to that section, the Secretary has issued almost 300 pages of regulations beginning at 20 C.F.R. Part 675. The regulations govern all areas of the CETA program including grant procedures, program design and management, administration, and fraud and program abuse prevention. Specifically § 676.62(b) of the regulations requires each recipient of federal funds to avoid conflicts of interest in awarding financial assistance, and § 676.65(b) provides:

> No person or organization ... may charge a fee to any individual for the placement or referral of that individual to any CETA program....

The legislative history of CETA also manifests Congress' intent that the Secretary retain supervisory control over the programs administered locally by prime sponsors. House Report No. 93–659 states the purpose of CETA was to "establish a decentralized and decategorized manpower program which will be responsible to local needs while at the same time maintaining necessary Federal supervision to insure that the national purposes in enacting the legislation are properly carried out." *Reprinted in* [1973] U.S.Code Cong. & Ad.News, at 2935 (emphasis supplied). The Report notes that CETA "... while providing for decentralization ... reaffirms the Federal role in assuring that manpower programs are operated in accord with Federal policy," *id.* at 2936, and that the programs "are subject to effective federal supervision ..... to insure that the requirements of the act are fulfilled," *id.* at 2941. The Report suggests various enforcement mechanisms for the Secretary, *id.* at 2942, and succinctly concludes:

> It is the intent of the Committee that the Secretary has ultimate responsibility for assuring that manpower programs and policies are carried out in accordance with the purposes and provisions of the Act.

*Id.*

This legislative history palpably indicates that the purpose of the CETA program was to put under one umbrella the many varied manpower employment and training programs antedating the Act. The concept of "prime sponsorship" was devised to insure that the program was responsive to local needs and to attain more efficient local administration of the program, but Congress never intended to abdicate the federal role in supervising how the federal funds were applied. The statute and regulations manifestly illustrate and implement that supervision.

To review Mosley's job specifically further supports the position that he was acting for and on behalf of the federal Government. Although he was a "state employee" in the sense that he had been hired by the state, his salary and the entire cost of the program he administered were funded by the federal Government for federal objectives. For the purpose of federal convenience he held the job of referring prospective employees to federally funded employment simply as a substitute for a federal employee hired by the federal Government. When we combine these characteristics with the purposes of § 201(g) "to protect the

public from the evil consequences of corruption in public service," *United States v. Griffin*, 401 F.Supp. 1222, 1230 (S.D.Ind. 1975), *affd.* 541 F.2d 284 (7th Cir. 1976), which has led courts to give a broad construction to § 201, *e. g., United States v. Evans*, 572 F.2d 455, 480 (5th Cir. 1978), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182, we conclude that the district court's decision was warranted. Mosley, like the HUD area manager in *Griffin*, was in a "position of responsibility and was enabled to exercise discretion to act for or on behalf of" the Secretary of Labor in administering the expenditure of federal funds, and he iniquitously abused that discretion. *Griffin*, 401 F.Supp. at 1230. The record in this case illustrates that Mosley's referrals were successful in obtaining jobs for those who paid the bribe, and thus Mosley was, in effect, authorizing the expenditure of federal funds *himself*. The instant case is unlike *Loschiavo* and *Del Toro* in this additional respect, because in those cases many other local officials and departments had to agree with the defendants' recommendations before federal funds were even requested. *Del Toro*, 513 F.2d at 662. In these circumstances we fully agree with the district court that Mosley was acting "on behalf" of the federal Government, and is therefore subject to the federal prohibitions of extortion. Section 201(g) of Title 18, therefore, applies.

## II

With regard to the misdemeanor counts under 18 U.S.C. § 665(b), Mosley claims he did not communicate a "threat of refusal to employ" Thomas or Campbell in order to solicit the bribes, as required by the statute.[3] Mosley argues that he gave only "preferential treatment" in referring Campbell and Thomas to the CETA jobs ahead of others on the waiting list, but that he never "refused to employ" them because without the referral, they had no right to the job. This argument can be easily dismissed. The success of Mosley's referrals indicates that he effectively held the power to grant CETA jobs. Without a referral slip from Mosley, neither Thomas nor Campbell would have obtained the job, and they received the slips and the jobs only after paying Mosley the bribe money. The fact that, technically, Mosley only moved Thomas and Campbell to the head of the waiting list for the CETA jobs is not a weighty consideration where the movement resulted in, and was required to receive, a CETA job. Additionally, Mosley cannot now protect himself behind the illegality of his own acts by claiming that the grants of the jobs out of order was improper, and thus not covered by § 665. Both Thomas and Campbell were eligible and qualified for the CETA jobs. Any lessening of their "right" to the jobs was a function only of the great number of applicants, not of their eligibility. Once Mosley violated the waiting list provisions and offered the job slips to Thomas and Campbell in return for the payments, he implicitly threatened that the employment for which they were eligible would be withheld unless the payments were made. The fact that the grant of the referral slips was itself a violation of the normal procedures customarily followed does not affect the fact that § 665(b) was violated by the act of threatening the loss of apparently available CETA jobs unless the payments were made. The jury's verdict, therefore, was supported by the evidence and the trial judge did not commit error by refusing to instruct the jury that these promises of preferential treatment were not "threats" to refuse employment governed by § 665. Consequently, the district court's judgment is

AFFIRMED.

---

**3.** 18 U.S.C. § 665(b) provides in pertinent part:

Whoever, by threat . . . of refusal to employ . . . in connection with a grant or contract of assistance under the Comprehensive Employment and Training Act of 1973, induces any person to give up any money or thing of value to any person (including such grantee agency) shall be fined not more than $1,000, or imprisoned not more than one year, or both.