**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Lee HINTON and Arthur Dixson,
Defendants-Appellants.**

**Nos. 81–2206, 81–2207.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1982.

Decided July 8, 1982.

---

Donald Morano, Chicago, Ill., for Dixson.

Richard D. Trainor, Chicago, Ill., for Hinton.

Terry G. Harn, Asst. U. S. Atty., Peoria, Ill., for plaintiff-appellee.

Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and ESCHBACH, Circuit Judge.

PELL, Circuit Judge.

The appellants, Arthur Dixson and James Lee Hinton, were found guilty by a jury of violating 18 U.S.C. § 201(c)(1) and (2) by soliciting money in exchange for the award of housing rehabilitation contracts funded under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301–5320 (Supp. III 1979) (the Act). Dixson and Hinton were, respectively, the Executive Director and Housing Rehabilitation Coordinator of a community-based, non-profit corporation called United Neighborhoods, Inc. (UNI). Pursuant to the Act, UNI had entered into a contract with the city of Peoria to administer federal funds awarded to Peoria under a Community Development Block Grant and a Federal Metro Reallocation Grant from the United States Department of Housing and Urban Development (HUD).[1] The Community Development Block Grant program administered by UNI was entirely sponsored by federal funds, which paid UNI's costs as well as the salaries of its employees. The primary issue in these appeals is whether Dixson and Hinton were "public officials" within the meaning of 18 U.S.C. § 201(c) (1976).

During 1979 and 1980, the city of Peoria received a Community Development Block Grant and Metro Reallocation Grant from HUD. The purpose of these grants was community development, including the rehabilitation of residential structures. In ac-

---

1. Both Community Development Block grants and Federal Metro Reallocation grants are governed by the Housing and Community Development Act of 1974. These grant programs shall be referred to collectively as the Community Development Block Grant program.

cordance with the Act and regulations pursuant to the Act, the city contracted with UNI to administer the grant funds. For housing that met the statutory and regulatory criteria for the funds, UNI had the responsibility of soliciting bids from contractors to perform the housing rehabilitation. After the receipt of bids, the Housing Committee of UNI was responsible for awarding the contract to the successful bidder. There was testimony, however, from several witnesses that contracts were awarded without obtaining the approval of the Housing Committee. Successful bidders were paid for their work by UNI from the grant funds it had received from the city, which had previously received the funds from HUD. UNI had to account to the city for the expenditure of the federal funds, and the city, in turn, was responsible for accounting to HUD for all funds it had received.

Ora Logsdon, a contractor who received several housing contracts from UNI, was the primary Government witness against Dixson and Hinton. He testified that he had received rehabilitation contracts for ten houses from UNI pursuant to an agreement with Dixson and Hinton to pay them 10% of the amount of each contract. He said he would pay Dixson and Hinton their 10% after cashing the checks he had received for his work from UNI.

Gerald Lilly, another contractor, testified that he had been told by Dixson that he should pay 10% of the contract price in order to receive a rehabilitation contract. At one point Lilly met with Dixson and Hinton who helped him prepare his bids. Hinton told Lilly on which houses to bid and recommended that the amount of one bid be lowered. Hinton also reassured Lilly that submitting the bids was just a formality. Subsequently Lilly paid Dixson when he received his first check from UNI.

## I. Hinton and Dixson as "Public Officials"

■ Section 201(c)(1) of 18 U.S.C. prohibits any "public official" from directly or indirectly asking, demanding, soliciting, accepting, or receiving anything of value in return for being influenced in the performance of any official act. 18 U.S.C. § 201(c)(1) (1976). Section 201(a) defines "public official" to include any person "acting for or on behalf of the United States or any department, agency or branch of Government thereof." 18 U.S.C. § 201(a) (1976). Both appellants, relying primarily on the decisions of the Second Circuit in *United States v. Loschiavo*, 531 F.2d 659 (2d Cir. 1976), and *United States v. Del Toro*, 513 F.2d 656 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), assert that they cannot be considered "public officials" because they were not acting for or on behalf of the United States.

This court's recent decision in *United States v. Mosley*, 659 F.2d 812 (7th Cir. 1981), is dispositive of the arguments advanced by the appellants in support of their position that they were not acting for or on behalf of the United States. In *Mosley*, we distinguished *Loschiavo* and *Del Toro* as involving a separate statutory scheme (the "Model Cities" program) from that in *Mosley* (the Comprehensive Employment and Training or "CETA" program). In light of the statute, regulations, and legislative history of the CETA program, we concluded that federal government involvement in the CETA program was more substantial than that in the Model Cities program, to the extent that Mosley was acting for or on behalf of the United States in the CETA program. This conclusion was buttressed by review of Mosley's position within the federal program. *Id.* at 814–15.

The present case involves a different statutory scheme from that in *Mosley*, and, for that matter, from that in *Loschiavo* and *Del Toro*. Although the Act consolidated into one program several community development programs including the Model Cities program at issue in *Loschiavo* and *Del Toro*, federal involvement in the Community Development Block Grant program differs significantly from what it had been in the Model Cities program. The Housing and Community Development Act of 1974 provides for substantial federal supervision over the cities and all sub-grantees respon-

sible for local distribution of grant funds. Two of the stated objectives of the Act are "substantial expansion of the greater continuity in the scope and level of Federal assistance" and the "development of a national urban growth policy by consolidating a number of complex and overlapping programs of financial assistance to communities of varying sizes and needs into a consistent system of Federal aid." 42 U.S.C. § 5301(b)(2) and (d) (Supp. III 1979).

In order for an applicant to receive a grant, the applicant must submit to the Secretary of HUD, *inter alia*, a three-year comprehensive community development plan, a detailed program of implementation, and a housing assistance plan, that must be approved by the Secretary prior to funding. *Id.* § 5304. The activities which may be performed under a Community Development Block Grant program are circumscribed in great detail. *Id.* § 5305. In addition, annual performance reports must be submitted with an assessment of compliance with the objectives of the Act. The Secretary is also directed to make reviews and audits of the grantees' programs on at least an annual basis to determine whether the grantees are meeting the federal standards and to adjust federal funds in accordance with such findings. *Id.* § 5304(d). The Secretary reserves the right to audit the financial transactions of fund recipients. *Id.* § 5304(g).

Pursuant to the statute, the Secretary of HUD has issued extensive regulations governing Community Development Block grants. 24 C.F.R. Part 570 (1981). These regulations govern in detail grant procedures, as well as program design, management, and administration. Specifically, section 570.204 governs eligible activities by private non-profit entities such as UNI. 24 C.F.R. § 570.204 (1981). Section 570.507 provides that OMB Circular No. A–102 governs the procurement of materials and services funded under the program and procured by subgrantees and subrecipients. *Id.* § 570.507. Section 570.509 reserves to the Secretary a right of access to all books, accounts, records, reports, files and other papers or property of subgrantees for the

purpose of making surveys, audits, examinations, excerpts, and transcripts. *Id.* § 570.509. Section 570.900 sets forth the performance standards by which all recipients of funds are to be evaluated by the Secretary, the reports to be submitted by recipients, and the records to be maintained by recipients. *Id.* § 570.900–.913.

Although the purpose of the Act was, in part, to allow flexibility to local units in administering the grants, the legislative history demonstrates that the Act was primarily intended to improve federal supervision over federal housing and urban development programs. Senate Report No. 93–693 notes that the consolidation of community development programs was designed to produce a single, more comprehensive community development program "primarily to insure that Federal funds would be used with a priority" to meet the objectives of the Act. *S.Rep.No.*93–693, 93d Cong., 2d Sess. 2, *reprinted in* 1974 *U.S.Code Cong. & Ad.News* 4273, 4274. Under the Community Development Block Grant program, as under the CETA program in *Mosley*, the federal funds flow from the local sponsor to the recipient of a contract rather than directly from the agency. Nevertheless, it is clear from the legislative history of the Act, as it was in the legislative history of CETA, that the purpose of this procedure was to streamline the funding process rather than to abdicate federal control over the substantive aspects of the program. Thus, the statute, regulations, and legislative history manifest Congress' intent to promote efficient, effective federal supervision over the Community Development Block Grant program. The extent of federal involvement is such that Dixson and Hinton were acting on behalf of the United States in their administration of the federal funds under the program.

Analysis of Dixson's and Hinton's positions within the program buttresses our conclusion that they were "public officials" within the meaning of § 201(a). The salaries of each and the entire cost of the program they administered were funded by the federal government for federal objec-

tives. Their employment by the state does not preclude a determination that they were acting on behalf of the United States. *See, e.g., United States v. Mosley,* 659 F.2d 812 (7th Cir. 1981); *United States v. Kirby,* 587 F.2d 876 (7th Cir. 1978); *United States v. Griffin,* 401 F.Supp. 1222 (S.D.Ind.1975), *aff'd without opinion sub nom. United States v. Metro Management Corp.,* 541 F.2d 284 (7th Cir. 1976); *United States v. Gallegos,* 510 F.Supp. 1112 (D.N.M.1981). Dixson, as Executive Director of UNI, and Hinton, as UNI's Housing Rehabilitation Coordinator, were acting as federal agents in the sense of having discretion in administering the expenditure of federal funds. In light of the broad interpretation to be accorded section 201, *United States v. Mosley,* 659 F.2d at 816, we conclude that Dixson and Hinton were acting on behalf of the United States and, therefore, were "public officials."

The appellants attach significance to testimony that only the Housing Committee could award contracts. However, there was also evidence Dixson and Hinton had awarded contracts without the approval of the Housing Committee. Indeed, apparently neither in dealing with the contractors displayed any aspect of hypobulia. Viewing the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the contractors favored by the appellants were successful in their bids, so that Dixson and Hinton were in effect authorizing the expenditure of federal funds themselves. Even if they had not been able to award contracts on their own, we question whether the requirement of Housing Committee approval alone would so attenuate the appellants' authority to administer federal funds as to preclude their status as public officials. *See United States v. Mosley,* 659 F.2d at 816.

The authority of the appellants in relation to the federal government is closely analogous to the authority of the defendant in *United States v. Griffin,* 401 F.Supp. 1222 (S.D.Ind.1975), *aff'd without opinion sub nom. United States v. Metro Management Corp.,* 541 F.2d 284 (7th Cir. 1976), and the appellants' attempts to distinguish that case are unpersuasive. In *Griffin,* the defendant was the principal officer and agent of a corporation awarded an area management broker contract by HUD. The corporation was responsible for soliciting competitive bids on housing contracts under a federal program. The corporation then submitted the three lowest bids to HUD with a recommendation that the lowest bid be accepted. Ordinarily the lowest bidder was awarded the contract if the bid met the federal criteria and estimate set by the area broker. The corporation received payment from HUD for each contract issued. As in the instant case, the defendant in *Griffin* solicited a 10% kickback for his favoritism in accepting bids although he alone did not have technical authority to award contracts. As the district court stated in finding the defendant Griffin, as well as the corporation, to be persons "acting for or on behalf of the United States":

> While the low bidder among those from which the area broker solicited bids was not guaranteed of being awarded the contract by HUD, testimony was presented that such low bidder was in fact awarded the job at least 95% of the time. Thus the Court feels that the defendants were placed in a position of responsibility and were enabled to exercise discretion to act for and on behalf of HUD in operating the system to provide for the rehabilitation of HUD properties. The mere fact that defendant Jack Griffin, as President of MMC, is an employee of the corporation and not of the United States does not prevent him from acting as a "public official" as defined in 18 U.S.C. § 201(a).

401 F.Supp. at 1230. Similarly, Dixson and Hinton had the authority and power to influence or control the dispersal of federal funds on behalf of HUD.[2] Accordingly,

---

2. In emphasizing the extent to which contracts were actually awarded based on Hinton's and Dixson's actions, we do not intend to suggest that the solicitation of a bribe actually had to have resulted in the award of a contract for a violation of section 201 to have occurred. *E.g.,*

Hinton and Dixson qualify as "public officials" within the meaning of section 201(c).[3]

## II. Sufficiency of the Evidence as to Hinton

 Hinton's remaining objections on appeal may be briefly addressed. Hinton claims that he was entitled to acquittal because there was insufficient evidence on all relevant counts for the jury to find that Hinton awarded any contracts, or that he accepted or solicited a bribe from Gerald Lilly as alleged in Count X of the indictment. Both objections are without merit.

On appeal the evidence must be viewed in the light most favorable to the Government, together with all reasonable inferences. As previously pointed out, the testimony of Ora Logsdon was that he had been awarded contracts which, according to other witnesses' testimony, had not been awarded by the Housing Committee. Logsdon testified that he had been awarded ten contracts, and that Hinton and Dixson had agreed to award him all the contracts he could handle if he paid them kickbacks. Oscar Penn, a member of the Housing Committee, testified that housing rehabilitation contracts were awarded that had not been approved by the Committee. As to Count X of the indictment,[4] there was testimony that Hinton, with assistance from Dixson, told Lilly on which houses to bid, that one bid had to be lower than he had originally made it, and that the bids were simply a formality. Lilly went to UNI's office with $2,000.00 from his first check from UNI, and paid the money to Dixson who was in the office at that time. This evidence, and the inferences which can be drawn therefrom, were sufficient to sustain the jury verdict as to Hinton on all counts.

## III. The Cross-Examination of Ora Logsdon

Hinton objects to the district court's refusal to allow him cross-examination of Logsdon for impeachment purposes based on Logsdon's purported misappropriation of certain UNI funds. Generally a trial court has wide discretion to limit cross-examination, with the standard on review for the adequacy of cross-examination on bias or motive being whether the jury had sufficient information to make a discriminating appraisal of the witness's bias or motive. *United States v. Fitzgerald*, 579 F.2d 1014 (7th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978).

 Logsdon admitted to bribing Hinton and Dixson. He was questioned in cross-examination about law enforcement officers having sought him out for information, about denying any involvement in the bribery to the officers, about his first interview by law enforcement officials in his attorney's office, and about owing money to the Government for unpaid taxes. The cross-examination made it clear that Logsdon was a party to the illegal transaction and that he had been sought out by law enforcement officials. This cross-examination was sufficient to allow the jury to assess adequately Logsdon's bias or motive so that the district court's limitation on further cross-examination was not an abuse of discretion.

---

*United States v. Arroyo*, 581 F.2d 649, 654 n.10 (7th Cir. 1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 838, 59 L.Ed.2d 34 (1979). The frequency with which the appellants effectuated the solicited result relates to their control and discretion over the funds and, thus, to the issue of whether they were acting on behalf of the United States in their positions.

3. We attach no significance to the testimony of James Barnes, program manager of the Chicago area office of HUD, that he was not specifically aware of UNI and was not required to be aware of its existence. Mr. Barnes' personal knowledge of a specific subgrantee in a regional area is of little probative value in assessing the pervasiveness of federal regulation of the program.

4. Count X alone was predicated on 18 U.S.C. § 201(c)(1) *and* (2). Section 201(c)(2) prohibits a public official from, directly or indirectly, asking, demanding, exacting, soliciting, seeking, accepting, receiving or agreeing to receive anything of value in return for being influenced to commit *or aid in committing*, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States. 18 U.S.C. § 201(c)(2) (1976) (emphasis added).

Finally, Hinton appears to suggest that the indictment was defective because it failed to allege how Hinton was acting for or on behalf of the United States. However, each count of the indictment alleged that Hinton and Dixson, as employees of UNI, were involved in accepting bids and awarding and administering contracts between UNI and contractors for the rehabilitation of housing under grant funds from HUD, a department of the Government of the United States, to the city of Peoria, pursuant to a contract between UNI and the city. These allegations of the indictment were clearly sufficient to apprise Hinton of the nature and elements of the charge as set forth in *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

For the reasons stated herein the judgment of the district court is as to both appellants on all counts

AFFIRMED.