## DIXSON *v.* UNITED STATES

No. 82–5279.   Argued October 12, 1983—Decided February 22, 1984*

---

*Together with No. 82–5331, *Hinton* v. *United States*, also on certiorari
to the same court.

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BRENNAN, REHNQUIST, and STEVENS, JJ., joined, *post*, p. 501.

*Donald V. Morano*, by appointment of the Court, 459 U. S. 1168, argued the cause for petitioners. With him on the briefs were *Michael P. Seng* and *Edward Burke Arnolds*. *Richard D. Trainor, Robert D. Quinlivan, Jr.*, and *Ronald F. Neville* filed a brief for petitioner in No. 82–5331.

*Richard G. Wilkins* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen*, and *Deputy Solicitor General Bator*.

JUSTICE MARSHALL delivered the opinion of the Court.

These consolidated cases present the question whether officers of a private, nonprofit corporation administering and expending federal community development block grants are "public officials" for purposes of the federal bribery statute. 18 U. S. C. § 201(a).

I

In 1979, the city of Peoria received two federal block grants from the Department of Housing and Urban Development (HUD). The first was a $400,000 Community Development Block Grant; the second a $638,000 Metro Reallocation Grant. Both grants were funded through the Housing and Community Development Act of 1974 (HCDA), 88 Stat. 633, as amended, 42 U. S. C. §§ 5301–5320 (1976 ed. and Supp. V). Under that Act, the Secretary of HUD is authorized to dispense federal block grants to state and local governments and nonprofit community organizations for urban renewal programs such as the rehabilitation of residential structures, code enforcement in deteriorating areas, and the construction of public works projects.

The city of Peoria subsequently designated United Neighborhoods, Inc. (UNI), a community-based, social-service organization, to be the city's subgrantee in charge of the administration of the federal block grant funds.[1] UNI in turn hired petitioner Dixson to serve as the corporation's Executive Director and petitioner Hinton as its Housing Rehabilitation Coordinator. Petitioner Dixson was responsible for the general supervision of UNI's programs, including fiscal control and execution of contracts. Petitioner Hinton's duties included contracting with persons applying for housing rehabilitation assistance, and contracting with demolition firms.

---

[1] Local recipients of HCDA block grants have the option of distributing the funds directly or of subcontracting the administration of the funds to private, nonprofit organizations. 42 U. S. C. §§ 5302(a)(1), (c) (1976 ed. and Supp. V); 24 CFR § 570.204 (1983).

A federal grand jury named petitioners in an 11-count indictment filed on March 12, 1981. The indictment charged that petitioners, as "public officials" under 18 U. S. C. § 201(a), had sought a series of bribes in return for "being influenced in their performance of an official act in respect to the awarding of housing rehabilitation contracts" in violation of 18 U. S. C. §§ 201(c)(1),(2).

According to the Government's evidence at trial, petitioners used their positions to extract $42,694 in kickbacks from contractors seeking to work on UNI's housing rehabilitation projects. One contractor testified how he was approached by petitioner Hinton and persuaded to pay petitioners 10 percent of each housing rehabilitation contract that petitioners awarded him. The contractor explained that on 10 occasions, he received first draw checks from UNI for 20 percent of the contract price, deposited the check at his bank, and paid half the amount of the check in cash to petitioners. A second contractor testified as to substantially the same arrangement.

Before trial, petitioners moved to dismiss the indictment on the grounds that they were not "public officials" within the meaning of the federal statute. Their motions were denied, and following a jury trial in the United States District Court for the Central District of Illinois, petitioners were convicted as charged. The District Court sentenced each to 7½ years' imprisonment, to be followed by 3 years' probation. Petitioners appealed to the United States Court of Appeals for the Seventh Circuit, which affirmed. 683 F. 2d 195 (1982). Both petitioners filed petitions for writs of certiorari, and we granted the writs. 459 U. S. 1085 (1982). We now affirm.

## II

Petitioners' sole claim is that they were not "public officials" within the meaning of 18 U. S. C. § 201(a) and therefore not subject to prosecution under the federal bribery

statute.[2] Since our disposition of this claim turns on the relationship between petitioners and the Federal Government, we begin our discussion with an analysis of the HCDA block grant program and petitioners' role in administering that program.

Congress passed the HCDA to meet the social, economic, and environmental problems facing cities. 42 U. S. C. § 5301(a) (1976 ed. and Supp. V). The primary objective of the Act is "the development of viable urban communities." § 5301(c). While the HCDA addressed a national problem, Congress enacted the legislation as a federal block grant statute, under which the day-to-day administration of the federal program, including the actual expenditure of federal funds, is delegated to state and local authorities.

The HCDA creates a "consistent system of Federal aid," § 5301(d), by distributing funds committed by Congress through organizations outside the Federal Government, while

---

[2] Title 18 U. S. C. § 201 reads in pertinent part:

"(a) For the purpose of this section: 'public official' means Member of Congress, the Delegate from the District of Columbia, or Resident Commissioner, either before or after he has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror;

.      .      .      .      .

"(c) Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:

"(1) being influenced in his performance of any official act; or

"(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the United States; . . .

.      .      .      .      .

"Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States."

retaining federal control to assure compliance with statutory federal objectives and implementing regulations. Congress itself specified the 17 categories of community projects upon which HCDA grants can be spent. § 5305. Within the federal constraints, grant recipients design programs addressing local needs. To obtain federal funds, local communities must submit to the Secretary a plan made in accordance with national urban growth policies, and supplement the plan with annual performance reports. §§ 5304(a), (d). The Federal Government retains the right to audit the records of HCDA programs, § 5304(e), and to recover improperly expended funds. § 5311(b)(2).

HCDA grantees give assurances to HUD that they, and their subgrantees, will abide by specific financial accountability, equal opportunity, fair labor, environmental, and other requirements. §§ 5304, 5309, 5310; 24 CFR § 570.307 (1983). By administering HCDA funds, private nonprofit organizations subject themselves to numerous federal restrictions beyond those imposed directly by HUD. Like other recipients of federal grant funds, HUD grantees and subgrantees are subject to a uniform audit procedure, adopted by the Federal Government as "an integral element" of "full accountability by those entrusted with the responsibility for administering the programs." [3]

UNI voluntarily assumed the status of an HCDA subgrantee when UNI and the city of Peoria signed five separate grant agreements in March and October 1979, pursuant to

---

[3] Guidelines for Financial and Compliance Audits of Federally Assisted Programs, reprinted at 45 Fed. Reg. 21837, 21838 (1980). The Guidelines explain the uniform audit procedure, and are distributed as Attachment P to OMB Circular A-102 (1980), Uniform Requirements for Assistance to State and Local Governments. See also OMB Circular A-110 (1976). Attachment O, which contains a Code of Conduct for administering federal funds, including a specific requirement that "the [grantee's] officers, employees or agents shall neither solicit nor accept . . . anything of monetary value from contractors or potential contractors [or parties to subagreements]."

which UNI hired petitioners. Under the first four of these agreements, the city promised to provide UNI with $492,500, and UNI committed itself to spend these funds on urban renewal projects and related administrative costs, such as salaries and fringe benefits for UNI employees. The agreements specifically allocated funds to petitioners' salaries: $16,000 of the city grants was for UNI's Executive Director and $15,500 was for a Rehabilitation Coordinator.

In a fifth agreement, Peoria promised UNI another $669,200 to be used "solely for a program operated by UNI which provides loans and grants to the rehabilitation of residential housing units in the designated Metropolitan Reallocation Grant Area." One anomaly in the five Peoria-UNI contracts is that, beyond this reference to the "Metropolitan Reallocation Grant Area" and to "312 loans,"[4] none of these first contracts explicitly refers to the federal Act or to UNI's new status of subgrantee.[5] UNI's application to participate in the federally funded program, however, unequivocally shows UNI's awareness of the Federal Government's relationship to, and interest in, the grant agreements. UNI's proposal to Peoria stated: "[W]e wish to undertake a joint effort with the City of Peoria to achieve the common goals as set forth in *the Housing and Community Develop-*

---

[4] One of Peoria's HCDA grants was a Metro Reallocation Grant. 42 U. S. C. § 5306(c) (1976 ed. and Supp. V). HUD rehabilitation loans to owners and tenants in urban renewal areas are called "312 loans." Pub. L. 88–560, § 312, 78 Stat. 790, codified at 42 U. S. C. § 1452b (1976 ed. and Supp. V). The Secretary of HUD is authorized by statute "to delegate to or use as his agent any Federal or local public or private agency or organization . . . to carry out the objectives of [the loan program]." § 1452b(f).

[5] When UNI and Peoria renewed their agreement for the following fiscal year, a few days after the period named in the indictment, they amended the first series of contracts to warrant in explicit terms that UNI would comply with HUD Community Development Block Grants regulations, 24 CFR pt. 570 (1983). Record, Govt. Exh. 25.

*ment Act* to insure safe, sanitary and decent housing for all people." Record, Govt. Exh. 19. (Emphasis added.)

Moreover, there is no suggestion in the record that petitioners and other UNI executives failed to understand that they were involved in a federal program. As described above, the task of distributing HCDA funds is governed in numerous respects by federal statutes and regulations. Knowledge of the existence and applicability of these federal requirements and guidelines is presumed as a matter of law.[6] As a matter of fact, the federal interest in protecting the integrity of its block grant funds undoubtedly was driven home to petitioners when, in early 1980, in the midst of the period covered by the Government's indictment, Arthur Andersen & Co. conducted an audit of UNI's records in accordance with HUD's Audit Guide and Standards for Community Development Block Grant Recipients.

Petitioners' responsibilities included receiving applications for housing assistance and soliciting contractor bids for qualified rehabilitation proposals. According to UNI's organizational structure, petitioners were supposed to submit the bids on qualified proposals to UNI's Housing Committee for final approval, but, in fact, the Committee's review was a "mere formality."[7] As a practical matter, petitioners alone decided which property owners and contractors in the city of Peoria would be the beneficiaries of the federal funds made available to the city through the HCDA block grant program.

### III

Petitioners contend now, as they have throughout this litigation, that, as executives of a private nonprofit corporation unaffiliated with the Federal Government, they were never

---

[6] 44 U. S. C. § 1507. The appearance of rules and regulations in the Federal Register gives legal notice of their contents.

[7] Of the 10 contracts awarded to one of the contractors who testified on behalf of the Government at trial, UNI's Housing Committee approved only one. Petitioner Hinton signed the remaining nine.

"public officials" as Congress defined that term. 18 U. S. C. § 201(a).

Under § 201(a), the term "public official" includes "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, . . . in any official function, under or by authority of any such department, agency, or branch of Government." There being no basis for claiming that petitioners were officers or employees of the United States, the Government's sole contention is that petitioners acted "for or on behalf of" the United States "in an official function" under the authority of HUD.

Petitioners argue that they cannot be considered to have acted "for or on behalf of the United States" because neither they nor their employer UNI ever entered into any agreement with the United States or any subdivision of the Federal Government. In advancing this position, petitioners rely primarily on two Second Circuit decisions holding that a New York City employee involved in the administration of the federal Model Cities Program was not a public official under § 201. *United States* v. *Loschiavo*, 531 F. 2d 659 (1976); *United States* v. *Del Toro*, 513 F. 2d 656, cert. denied, 423 U. S. 826 (1975). Petitioners and these Second Circuit decisions rest on the premise that an individual does not work "for or on behalf of the United States . . . in any official function" without some formal bond with the United States, such as an agency relationship, an employment contract, or a direct contractual obligation.

The Government, in response, argues that the term "public official" has a broader sweep, covering not only parties in privity with the United States, but also any private individuals responsible for administering federally funded and federally supervised programs. The Government defends the decision of the Seventh Circuit in the instant cases which held that the "substantial federal supervision over the cities and all sub-grantees responsible for local distribution of grant funds" made petitioners' public officials for purposes of § 201.

683 F. 2d, at 197–198.   The court reasoned that petitioners "were acting as federal agents in the sense of having discretion in administering the expenditure of federal funds."   *Id.*, at 199.

As is often the case in matters of statutory interpretation, the language of § 201(a) does not decide the dispute.   The words can be interpreted to support either petitioners' or the Government's reading.   We must turn, therefore, to the legislative history of the federal bribery statute to determine whether these materials clarify which of the proposed readings is consistent with Congress' intent.   If the legislative history fails to clarify the statutory language, our rule of lenity would compel us to construe the statute in favor of petitioners, as criminal defendants in these cases.   See *Rewis* v. *United States*, 401 U. S. 808, 812 (1971).

## A

Congress passed the current federal bribery provisions, including § 201(a), in 1962, as part of an effort to reformulate and rationalize all federal criminal statutes dealing with the integrity of government.   At the time of the 1962 revisions, general federal bribery statutes had been in existence for more than a century.   From the start, Congress drafted its bribery statutes with broad jurisdictional language,[8] and

---

[8] Congress passed the first federal bribery statute of general application in 1853.   See Act of Feb. 26, 1853, ch. 81, § 6, 10 Stat. 171.   As its name— "An Act to Prevent Frauds upon the Treasury"—implies, the Act sought to prevent the misuse of federal funds by any person charged with a public trust.   See Cong. Globe, 32d Cong., 2d Sess., 392 (1853).   Although primarily concerned with individuals who were bringing fraudulent claims against the United States, *id.*, at 242, 295–296, Congress did not limit this early statute to fraudulent claims, but chose to draft a general provision encompassing the bribery not only of Members of Congress, but also of "any officer of the United States, *or person holding any place of [public] trust or profit, or discharging any official function* under, or in connection with, any department of the Government of the United States."   (Emphasis supplied.)

periodically amended the provisions to ensure that the scope of federal criminal liability kept pace with the growth and diversification of the Federal Government.[9] Prior to 1962, in recognition of Congress' apparent desire for the federal bribery statutes to have wide application, the federal judiciary interpreted the statutes and, indeed, the phrase "person acting for or on behalf of the United States" to have a broad jurisdictional reach.[10]

When drafting § 201(a), Congress was aware of previous federal bribery statutes, as well as the judicial interpretation given those statutes. The phrase at issue here—"person

---

[9] One telling amendment came in 1948, largely as a result of this Court's decision in *United States* v. *Strang*, 254 U. S. 491 (1921). In *Strang*, the Court had considered whether a person working for a federally owned and controlled corporation was covered by the 1909 version of the federal conflict-of-interest statute. Act of Mar. 4, 1909, ch. 321, § 41, 35 Stat. 1097. The Court ruled that such a person was not covered because his employer was "a separate entity" from the United States. 254 U. S., at 493. To Congress, the *Strang* decision indicated that the existing federal bribery statute was inadequate to reach "the present ramifications of the executive branch [which] were not foreseen" when the 1909 Code was enacted. H. R. Rep. No. 304, 80th Cong., 1st Sess., A14 (1947). Accordingly, the 1948 Congress supplemented its earlier language to read "any officer or employee or person acting for or on behalf of the United States, *or any department or agency thereof*, in any official function, under or by authority of any *such department or agency*." Act of June 25, 1948, ch. 645, § 201, 62 Stat. 691 (italics indicate new language). While the 1948 amendment expressly broadened the scope of the federal bribery law, a House Report suggests that drafters of the 1948 revisions were uncertain whether the amendments were necessary and included them only to guarantee "what appeared unquestionably to be the intent of Congress, namely, to cover all persons acting for the United States Government in an official function." H. R. Rep. No. 304, *supra*, at A15.

[10] For instance, before 1948, employees of Government agencies were not expressly covered by the federal bribery statutes. See n. 9, *supra*. Nevertheless, federal courts repeatedly found that these employees were covered by the term "person acting for or on behalf of the United States." See, *e. g.*, *United States* v. *Birdsall*, 233 U. S. 223, 230–231 (1914); *United States* v. *Levine*, 129 F. 2d 745 (CA2 1942). But cf. *United States* v. *Strang, supra*.

acting for or on behalf of the United States"—was taken directly from predecessor bribery statutes.[11]  Moreover, the reenactment of this language was no happenstance.  Earlier versions of the 1962 statute omitted the phrase, but Department of Justice testimony that "its removal would be undesirable" convinced Congress to retain the language.[12]

Standing alone, Congress' purposeful retention of the "acting for or on behalf of the Government" phrase does not advance our inquiry into the scope and meaning of those words.  When, however, we compare the phrase as enacted with the proposed definition of "public official" in earlier draft bills that were not enacted, we conclude that Congress could not have meant to restrict the definition, as petitioners argue, to those persons in an employment or agency relation-

---

[11] The term "any person acting for or on behalf of the United States" was coined in the recodifications of the 1870's, Rev. Stat. §§ 5451, 5501, and replaced the phrase "person holding any place of [public] trust or profit, or discharging any official function under, or in connection with [the Government]," which appeared in previous statutes.  See n. 8, *supra*.  For purposes of our decision today, it is of some relevance that the term "persons acting for or on behalf of the United States" was originally drafted as a stylistic substitution for "person[s] holding any [position] of [public] trust," and that Congress accepted the analogous language.  See 2 Cong. Rec. 129 (1873) (remarks of Rep. Butler) (statutory Revision Committee's authority limited); Dwan & Feidler, The Federal Statutes—Their History and Use, 22 Minn. L. Rev. 1008, 1012–1017 (1938) (1878 version corrected congressionally identified errors in 1873 Rev. Stat.).

[12] Federal Conflict of Interest Legislation: Hearings on H. R. 302, H. R. 3050, H. R. 3411, H. R. 3412, and H. R. 7139 before the Antitrust Subcommittee of the House Committee on the Judiciary, 87th Cong., 1st Sess., 36 (1961).  The Department of Justice analysis of H. R. 3411 stated:

"The definition of 'public official' . . . does not include any reference to persons 'acting for or in [sic] behalf of the United States.'  This latter phrase appears in the existing law and we think its removal would be undesirable.  Under the proposed definition it could be construed that, under certain circumstances, a person acting in behalf of the United States would not be held to be an 'officer, agent, or employee of the United States' as these terms are used in the bill.  Persons acting in such a capacity should be protected from bribe offers (or punished for their acceptance)."  *Ibid.*

ship with the Federal Government. Such persons were clearly covered by successive, rejected versions of the reform bill, which defined "public official" in pertinent part as "an officer, agent, or employee of the United States in the executive, legislative, or judicial branch of the Government, or of any agency." [13] If Congress intended courts to restrict their reading of the jurisdictional definition to persons in a formal employment or agency relationship with the Government, it would have had no reason to accede to the Department of Justice's urging to retain the "acting for or on behalf of" language.

Moreover, we find the legislative history of § 201(a) inconsistent with the view that the words "person acting for or on behalf of the United States" were added simply to bring within the jurisdiction of the federal bribery laws those individuals tied to the Federal Government by direct contractual obligations. Committee Reports from both Houses of Congress emphasized that the new bribery laws made "no significant changes of substance" and "would not restrict the broad scope of the present bribery statutes as construed by the courts." S. Rep. No. 2213, 87th Cong., 2d Sess., 4 (1962); H. R. Rep. No. 748, 87th Cong., 1st Sess., 17 (1961). Federal courts interpreting the federal bribery laws prior to 1962 had generally avoided formal distinctions, such as the requirement of a direct contractual bond, that would artificially narrow the scope of federal criminal jurisdiction. See n. 10, *supra*.

Of particular relevance to the instant case is the House Judiciary Committee's citation of the Second Circuit's decision in *United States* v. *Levine*, 129 F. 2d 745 (1942), as an exam-

[13] See H. R. 12547, 85th Cong., 2d Sess., § 201(a) (1958); H. R. 2156, 86th Cong., 1st Sess., § 201(a) (1959); H. R. 3411, 87th Cong., 1st Sess., § 201(a) (1961). The complete definition of "public official" in each of these bills was: "Member of, or Delegate to Congress, or Resident Commissioner, either before or after he has qualified, an officer, agent, or employee of the United States in the executive, legislative, or judicial branch of the Government, or of any agency, or juror."

ple of how the judiciary had in the past properly construed the federal bribery laws. See H. R. Rep. No. 748, *supra*, at 17. The *Levine* decision involved the application of the 1909 bribery statute to a low-level official in a decentralized federal assistance program.[14] The defendant in *Levine* worked for a locally administered price stabilization program, the New York Metropolitan Milk Marketing Area,[15] and was responsible for receiving milk handlers' market surplus claims, and checking them for accuracy. Levine solicited a bribe from one of the handlers within his jurisdiction in return for his promise to prevent investigations of the claims.

Although hired by a Market Administrator who, in turn, had been appointed by the Secretary of Agriculture, Levine himself was neither employed by the United States nor paid with federal funds. Nevertheless, Levine's duties were critical to the proper administration of the federally assisted New York Milk Marketing Area. Because claims for payment were not rechecked by anyone else, his duties resulted in expenditures from the Federal Treasury. After review-

---

[14] At the time of the *Levine* opinion, the federal bribery statute applied by its terms only to officers of the United States or persons acting for or on behalf of the United States or Congress in any official capacity. § 117 of the Criminal Code of 1909, 18 U. S. C. § 207 (1946 ed.).

[15] The program was established by the Secretary of Agriculture to achieve goals set by the Agricultural Marketing Agreement Act of 1937. See 5 Fed. Reg. 1258 (1940). The Act authorized the Secretary to stabilize farm prices by issuing marketing orders to regulate production in whichever regions of the country were in need of such assistance. 7 U. S. C. §§ 601, 608c (1940 ed.). As such, the Act was an early form of federal assistance program, and, in its present form, is still classified as such. See Office of Management and Budget, Catalog of Federal Domestic Assistance § 10.155 (1983). A Marketing Administrator, appointed by the Secretary of Agriculture and paid with federal funds, was to supervise the Area. The Marketing Administrator was to hire his own staff to administer the price stabilization program locally. The staff salary and other administrative expenses were to be paid through a levy imposed on milk producers within the Area. 5 Fed. Reg. 1263 (1940).

ing these facts, the Second Circuit concluded that, notwithstanding the absence of a direct contractual bond between the defendant and the United States, Levine's responsible position made him a "public official" for purposes of the federal bribery laws. 129 F. 2d, at 747. By explicitly endorsing the Second Circuit's analysis in *Levine*, the House Judiciary Committee strongly intimated that the phrase "acting for or on behalf of the United States" covers something more than a direct contractual bond.

Congress' longstanding commitment to a broadly drafted federal bribery statute, its expressed desire to continue that tradition with the 1962 revisions, its affirmative adoption of the language at issue in this case, and the House Report's endorsement of the Second Circuit's reasoning in *Levine*, combine to persuade us that Congress never intended § 201 (a)'s open-ended definition of "public official" to be given the cramped reading proposed by petitioners. We agree with the Government that § 201(a) has been accurately characterized as a "comprehensive statute applicable to all persons performing activities for or on behalf of the United States," whatever the form of delegation of authority.[16] To determine whether any particular individual falls within this category, the proper inquiry is not simply whether the person had signed a contract with the United States or agreed to serve as the Government's agent, but rather whether the person occupies a position of public trust with official federal responsibilities. Persons who hold such positions are public officials within the meaning of § 201 and liable for prosecution under the federal bribery statute.

## B

Given the structure of the HCDA program and petitioners' responsible positions as administrators of the subgrant, we

---

[16] Conflicts of Interest: Hearing on H. R. 8140 before the Senate Committee on the Judiciary, 87th Cong., 2d Sess., 22 (1962) (statement of Deputy Attorney General Katzenbach).

have little difficulty concluding that these persons served as public officials for purposes of § 201(a). As executives of UNI, petitioners had operational responsibility for the administration of the HCDA grant program within the city of Peoria. In allocating the federal resources made available to the city through the HCDA grant program, petitioners were charged with abiding by federal guidelines, which dictated both where and how the federal funds could be distributed. By accepting the responsibility for distributing these federal fiscal resources, petitioners assumed the quintessentially official role of administering a social service program established by the United States Congress.

Lest there be any doubt that Congress intended § 201(a) to cover local officials like petitioners, one need only compare petitioners to the defendant in *Levine*, whose conviction the House Judiciary Committee explicitly endorsed. See *supra*, at 494–496. Both Levine and petitioners worked in decentralized federal assistance programs. Both Levine and petitioners effectively determined who would be the beneficiary of federal dollars, and both solicited bribes to influence their official decisions. Levine held a position of public trust with official federal responsibilities: to collect and investigate the accuracy of data submitted by milk producers in support of their claims for federal subsidies. Petitioners held a position of public trust with official federal responsibilities: allocating federal resources, pursuant to complex statutory and regulatory guidelines, in the form of residential rehabilitation contracts. Indeed, in certain respects, petitioners performed duties that were more clearly "official" and more obviously undertaken "for or on behalf of the United States" than the responsibilities of the defendant in *Levine.* Where Levine was paid through a levy imposed on local businesses participating in the marketing order, petitioners' salaries were completely funded by the HCDA grant. Where Levine simply compiled data that were submitted to the Department of Agriculture for eventual disbursement, petitioners personally

bestowed the benefits of the HCDA program to residents of Peoria.

## IV

### A

In concluding that employment by the United States or some other similarly formal contractual or agency bond is not a prerequisite to prosecution under the federal bribery statute, we are supported by the majority of recent decisions in the Federal District Courts and Courts of Appeals. In *United States* v. *Hollingshead*, 672 F. 2d 751 (1982), the Ninth Circuit determined that an employee of the Federal Reserve Bank of San Francisco, which is a private banking institution, was a public official for purposes of § 201(a) because the employee was responsible for carrying out tasks delegated by a federal agency and was subject to substantial federal supervision. The defendant received bribes and kickbacks from independent contractors to influence him in making capital purchase requisitions. In short, like petitioners, he was in a position of responsibility, acting for or on behalf of the Federal Government in administering expenditure of federal funds. Similarly, in *United States* v. *Kirby*, 587 F. 2d 876, 879–880 (1978), the Seventh Circuit ruled that two privately employed grain inspectors, licensed by the Department of Agriculture, were public officials because they had responsibility for implementing a warehouse licensing program established by Congress.[17] For analogous reasons, the

---

[17] Petitioners argue that the *Kirby* defendants were liable under the federal bribery statute only because the Grain Standards Act explicitly provides that grain inspectors are "persons acting for or on behalf of the United States" for purposes of § 201(a). See 7 U. S. C. § 84(d). We disagree with this analysis. The *Kirby* defendants acted under the United States Warehouse Act, 7 U. S. C. § 252, which unlike the Grain Standards Act makes no reference to § 201(a).

We also reject petitioners' more general argument that because § 201(a) is incorporated directly into the Grain Standards Act, Congress did not intend for § 201(a) to apply to other private individuals who conduct analogous services on behalf of the United States. Precisely this argument was

Federal District Court for the District of New Mexico found a state employee responsible for administering the Farmers Home Administration rural housing improvement grant program to be included within § 201(a). *United States* v. *Gallegos*, 510 F. Supp. 1112, 1113–1114 (1981). Again, the defendant's official duties in processing grant applications directly influenced the expenditure of federal funds. See also *United States* v. *Mosley*, 659 F. 2d 812 (CA7 1981); *Harlow* v. *United States*, 301 F. 2d 361 (CA5), cert. denied, 371 U. S. 814 (1962); *United States* v. *Griffin*, 401 F. Supp. 1222 (SD Ind. 1975), affirmance order *sub nom. United States* v. *Metro Management Corp.*, 541 F. 2d 284 (CA7 1976). But see *United States* v. *Loschiavo*, 531 F. 2d 659 (CA2 1976); *United States* v. *Del Toro*, 513 F. 2d 656 (CA2), cert. denied, 423 U. S. 826 (1975); *United States* v. *Hoskins*, 520 F. Supp. 410 (ND Ill. 1981).

## B

By finding petitioners to be public officials within the meaning of § 201(a), we do not mean to suggest that the mere presence of some federal assistance brings a local organization and its employees within the jurisdiction of the federal bribery statute or even that all employees of local organizations responsible for administering federal grant programs are public officials within the meaning of § 201(a). To be a public official under § 201(a), an individual must possess some degree of official responsibility for carrying out a federal program or policy. Our opinion today is, therefore, fully consistent with *Krichman* v. *United States*, 256 U. S. 363

raised in and disposed of by the Second Circuit in *Levine*, the case cited by Congress as correctly construing a predecessor of § 201(a). See *supra*, at 494–496. The Second Circuit wrote, and we agree:

"The mere fact that several other Acts creating different agencies of government have specifically provided that the employees of those agencies are to be subject to this criminal provision does not, of course, mean that the broad provisions of the section are not applicable to this Market Administrator and his employees." 129 F. 2d, at 748.

(1921), in which this Court ruled that a baggage porter, although employed by a federally controlled railroad, could not be said to have "acted for or on behalf of the United States" because the porter lacked any duties of an official character. Similarly, individuals who work for block grant recipients and business people who provide recipients with goods and services cannot be said to be public officials under § 201(a) unless they assume some duties of an official nature.

We recognize that the manner in which the HCDA block grant program combines local administration with federal funding initially creates some confusion as to whether local authorities administering HCDA grants should be considered public officials under the federal bribery statute.[18] However, when one examines the structure of the program and sees that the HCDA vests in local administrators like petitioners Hinton and Dixson the power to allocate federal fiscal resources for the purpose of achieving congressionally established goals, the confusion evaporates and it becomes clear that these local officials hold precisely the sort of positions of national public trust that Congress intended to cover with the "acting for or on behalf of" language in the bribery statute.[19] The Federal Government has a strong and legitimate

---

[18] We have noted the juxtaposition of local control over daily operations and federal retention of oversight of its funds in another context. In *United States* v. *Orleans*, 425 U. S. 807 (1976), the Court noted that federal funding and federal regulation do not convert the acts of recipients, be they entrepreneurs or States, into federal governmental acts, for purposes of the Federal Tort Claims Act, precisely because the local entities, such as UNI, have complete control over daily operations. We also noted, however, that those entities are responsible to the United States for compliance with the specifications of a contract or grant. *Id.*, at 815–816. Regulation and oversight of the funds, as stressed in *Orleans*, is aimed precisely at the harm that occurred here—diversion of federal money to unauthorized purposes. *Id.*, at 818.

[19] Because the legislative history of § 201(a) shows that Congress intended the phrase "persons *acting for or on behalf of the United States . . . in any official function*" to encompass individuals like petitioners, we have no need to resort to the rule of lenity in deciding this case. " 'The canon in

interest in prosecuting petitioners for their misuse of Government funds. As this Court has said in another, closely related context, grant funds to state and local governments "are as much in need of protection from [fraud] as any other federal money, and the statute does not make the extent of [grant moneys'] safeguard dependent upon the bookkeeping devices used for their distribution." *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 544 (1943) (footnote omitted) (holding that one who contracts with a local governmental unit to work on federally funded projects can "cheat the United States" through the state intermediary).

Because we agree with the Seventh Circuit that petitioners were public officials under § 201(a), the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN, JUSTICE REHNQUIST, and JUSTICE STEVENS join, dissenting.

The rule of lenity demands that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States*, 401 U. S. 808, 812 (1971). The Court concludes that congressional intent to include persons like petitioners within the coverage of 18 U. S. C. § 201 is clear enough to make the rule of lenity inapplicable. The statutory language admits of the Court's reading, and the case for that reading would be strong, though perhaps not persuasive, if § 201 were a civil statute. I differ with the Court in that I find the evidence of congressional intent too weak to meet the higher standard for resolving facial ambiguity against a defendant when interpreting a criminal statute. In my view, the evidence of intent offered by the Court's

---

favor of strict construction [of criminal statutes] . . . does [not] demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.'" *United States* v. *Moore*, 423 U. S. 122, 145 (1975), quoting *United States* v. *Brown*, 333 U. S. 18, 25–26 (1948).

opinion cannot carry the weight the Court places on it, and there is good reason to reject the Court's interpretation of the statute.

## I

The language of § 201 and of its predecessors, as the Court's opinion points out, is intentionally broad. But that fact merely creates the interpretive problem—it does not resolve it. Congress intended to carry forward the pre-1962 bribery statute when it enacted § 201, and it understood the coverage of the bribery law to be broad. See *ante*, at 491–493, 494–495. Moreover, the purpose of the statute was undoubtedly to proscribe bribery of all those who carry out a federal trust. *Ante*, at 496. To say that the statute is broadly aimed at all persons bearing a federal trust, however, is not to resolve the ambiguity over what constitutes a federal trust. Indeed, the statutory language—"acting for or on behalf of the United States"—is merely a formulation of the public trust idea, and the Court concedes that the statutory language can accommodate both petitioners' and respondent's views. *Ante*, at 491. The breadth of the language accordingly offers little help in defining the ambiguous coverage of the statute.

The legislative history likewise provides no significant support for the Court's reading of the statute. The critical statutory language has been a part of the federal bribery statute for more than 100 years. See *ante*, at 493, n. 11. Yet, as the Court's opinion indicates, Congress apparently has never specifically considered the statute's coverage of federal grant recipients. The legislative history is simply silent on the question to be answered in these cases.

The Court mentions the 1948 extension of the bribery statute and suggests that it is significant. *Ante*, at 492, n. 9. As the legislative history of that extension makes clear, the only specific purpose of the extension was to ensure coverage of persons acting for federally owned or controlled corporations. *Ibid.;* H. R. Rep. No. 304, 80th Cong., 1st Sess., A14

(1947). There is no reason to believe, and it would be exceedingly odd to suggest, that Congress thought of federal grant recipients generally, or of grant recipients that are state or local governments in particular, as somehow analogous to federally controlled corporations. Accordingly, the 1948 extension provides no support for reading the bribery statute to cover persons like petitioners.

The legislative history of § 201 from the 87th Congress, which enacted the current version of the statute, contains two items that bear on the meaning of the statute's "acting for . . ." language. The Court relies heavily on these two items. One, however, offers no support for the Court's reading, and the other offers support of, at best, weak and uncertain significance.

First, the Court notes, *ante*, at 494–495, that the House Judiciary Committee cited *United States* v. *Levine*, 129 F. 2d 745 (CA2 1942), as an example of judicial construction of the statute. H. R. Rep. No. 748, 87th Cong., 1st Sess., 18 (1961). The Court concludes that this citation establishes congressional intent to include within the coverage of the bribery statute persons other than those with direct contractual bonds to the United States. *Ante*, at 496. That conclusion is surely correct. But saying that the class covered by the statute includes more than direct contractors does not begin to define the class actually covered and, in particular, does not imply that the class includes individuals employed by federal grant recipients or by their subgrantees.

Moreover, the *Levine* case itself does not suggest inclusion of such individuals. The individual involved in *Levine* was an employee of a person appointed by the Federal Government to carry out a federally defined regulatory task. As an employee of an agent of the United States, he was obviously acting for the United States. An employee of a grantee or subgrantee of the United States is in a quite different position. It is by no means obvious that such a person is acting for the United States, since a grantee does not necessarily have an agency relationship with the United States. In-

deed, as the Court concedes, *ante*, at 499, not all recipients of federal grant funds are acting for the United States: for example, recipients of science research funds are surely not acting for the United States, even when they use some of those funds to purchase assistance in accordance with the federally approved grant proposal. That Congress approved the *Levine* case simply cannot support an inference that Congress intended the bribery statute to cover persons in petitioners' position.

The Court also relies on the 87th Congress' retention of the "acting for . . ." language after several bills not containing that language had been proposed. *Ante*, at 493–494. Those bills proscribed acceptance of a bribe by "an officer, agent, or employee of the United States in the executive, legislative, or judicial branch of the Government, or of any agency." See *ante*, at 494, n. 13. The Department of Justice recommended retention of the pre-1962 language because the proposed "officer, agent, or employee" language "could be construed" to be narrower than the "acting for . . ." language. See *ante*, at 493, n. 12. The Court accordingly concludes that Congress intended the bribery statute to cover more than those persons with a formal employment or agency relationship with the United States.

This conclusion is too strong. Neither the Department of Justice testimony nor anything else in the legislative history explains what persons were thought to be outside the coverage of the discarded bills but within the coverage of the "acting for . . ." language. For all the legislative history shows, no one in Congress or appearing before Congress had any such persons in mind. Indeed, the Court's interpretation of the statute suggests as much. Anyone who "occupies a position of public trust with official federal responsibilities," *ante*, at 496, would seem to be an "agent" of the United States when carrying out those responsibilities, since the Court gives meaning to its public trust test by requiring federal direction of the tasks to be performed by the person bribed, *ante*, at 496–498, 500. See Restatement (Second) of Agency § 1

(1958) (agency relationship created when one person agrees with another "that the other shall act on his behalf and subject to his control"). The most that can be said of Congress' reenactment of the "acting for . . ." language following the proposal and criticism of the alternative bills is that Congress thought that there could conceivably be some difference between the enacted and unenacted language and that the pre-1962 language should be retained out of caution, as Congress did not intend to narrow the coverage of the bribery statute.

The conclusion that employees of federal grant recipients or their subgrantees were intended to be covered by the federal bribery statute finds as little support in the cases cited by the Court, *ante*, at 498–499, as it does in the statutory language and legislative history. The only case from this Court that interpreted the language at issue is *Krichman* v. *United States*, 256 U. S. 363 (1921), and that case, if relevant at all, cannot support the Government, since it held that the defendant was not covered by the bribery statute. The lower court cases relied on by the Court that involve grant-in-aid programs are in conflict. Compare *United States* v. *Loschiavo*, 531 F. 2d 659 (CA2 1976); *United States* v. *Del Toro*, 513 F. 2d 656 (CA2 1975); *United States* v. *Hoskins*, 520 F. Supp. 410 (ND Ill. 1981), with *United States* v. *Mosley*, 659 F. 2d 812 (CA7 1981); 683 F. 2d 195 (CA7 1982) (decision below in these cases). Thus, there is no consistent lower court construction of the statute as it applies to grant recipients to bolster the Court's reading.

The other cases cited by the Court all involved persons in circumstances quite distinguishable from that of employees of federal grant recipients or their subgrantees. *United States* v. *Hollingshead*, 672 F. 2d 751 (CA9 1982), involved an employee of a "fiscal arm" of the Federal Government "carrying out tasks delegated by a government agency." *Id.*, at 754. *United States* v. *Kirby*, 587 F. 2d 876 (CA7 1978), involved persons acting under federal licenses as grain inspectors for the Federal Government. *United States* v. *Gallegos*, 510 F. Supp. 1112 (NM 1981), involved an individual who "had been

assigned to work in an office of the Farmers Home Administration . . . to assist in administering an FHA program." *Id.*, at 1113. *Harlow* v. *United States*, 301 F. 2d 361 (CA5), cert. denied, 371 U. S. 814 (1962), involved an employee of a federal instrumentality operating on United States military bases. *United States* v. *Griffin*, 401 F. Supp. 1222 (SD Ind. 1975), affirmance order *sub nom. United States* v. *Metro Management Corp.*, 541 F. 2d 284 (CA7 1976), involved a person under direct contract with the Federal Government to solicit and receive bids for federal rehabilitation contracts and to prepare and inspect property that is under the control of the Federal Government and is eligible for such rehabilitation. In all of these cases the person bribed had a more or less direct agency relationship with the Federal Government. None of the cases dealt with a federal grant program and the accompanying uncertainty about whether the bribed person's activities were being carried out solely on the grantee's behalf, though with financial support from the Federal Government, or were being carried out on behalf of the Federal Government.

In sum, neither the statutory language, legislative history, nor case law provides any persuasive evidence that Congress intended the federal bribery statute to apply to persons in petitioners' position. The Court's conclusion requires some affirmative reason to believe that Congress thought that employees of federal grant recipients or their subgrantees are acting for or on behalf of the Federal Government, even when the grant recipient is a state or local government. No such reason, and certainly no reason strong enough to escape the pull of the rule of lenity, has been advanced.

## II

Not only is there an absence of support for the Court's conclusion, but there are several reasons to reject it. Federal grant programs to state and local governments as well as to private organizations have been in existence since the 19th century. See 1 R. Cappalli, Federal Grants and Cooperative

Agreements §§ 1.19–1.22 (1982); Elazar, Federal-State Collaboration in the Nineteenth Century United States, 79 Pol. Sci. Q. 248 (1964). By the middle of this century, grant programs to state governments in particular were a major component of the federal budget. When Congress enacted § 201 in 1962, it was spending more than $7 billion a year, or approximately 7% of the federal budget, on grants to state and local governments. See United States Bureau of the Census, Historical Statistics of the United States, Colonial Times to 1970, Part 2, pp. 1123, 1125 (1975). That amount increased to more than $40 billion by 1975 and today stands at approximately $90 billion, more than 10% of the federal budget. See Executive Office of the President, Office of Management and Budget, Special Analyses, Budget of the United States Government, Fiscal Year 1984, p. H–16 (1983).

Against this background, the long congressional and judicial silence on the application of the federal bribery statute to persons like petitioners takes on added significance. Despite the magnitude of federal grant programs in general and of federal programs making grants to state and local government in particular, there is no indication that Congress has ever considered whether employees of grant recipients are "public officials" within the meaning of the federal bribery statute, even though Congress studied and revised the statute in both 1948 and 1962. Moreover, there appears to be no reported case involving a prosecution against such employees under § 201 or its predecessors until the early 1970's. The Second Circuit's 1975 case, *United States* v. *Del Toro, supra,* decided at a time when federal grants to state and local governments totaled more than $40 billion, is apparently the first case to have presented the problem. Given that bribery of persons responsible for administering federal grant funds is exceedingly unlikely to be a recent phenomenon, cf. *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537 (1943) (bid-rigging by contractors with local governments administering federal funds); *United States* v. *Laudani,* 320

U. S. 543 (1944) (kickbacks to subcontractor of Port of New York Authority on project receiving federal grant money), the most plausible inference is that neither Congress nor federal prosecutors believed that the federal bribery statute extended to employees of federal grant recipients or their subgrantees, at least when the grantee is a state or local government.

That inference is supported by the fact that federal grant programs generally, and grant-in-aid programs to state and local governments in particular, are categorically different, and are treated by law as categorically different, from other types of federal activity. Such programs have been treated as forming a distinctive category of governmental activity by statute, see Federal Grant and Cooperative Agreement Act of 1977, 92 Stat. 3, 41 U. S. C. §§ 501–506, 508, 509 (1976 ed. and Supp. V), and by regulation, see 1 R. Cappalli, *supra*, §§ 5.01–5.56. The main defining characteristic of the category is the principle of grantee autonomy: although grants impose conditions on the use of grant funds, grantees are left considerable discretion to design and execute the federally assisted programs without federal intrusion. See 41 U. S. C. § 504 (1976 ed., Supp. V) (definition of "grant" requires that "no substantial involvement is anticipated between the executive agency, acting for the Federal Government, and the State or local government or other recipient during performance of the contemplated activity"); 1 R. Cappalli, *supra*, § 1.07. That principle means that the grantee's activities are typically not attributable to the United States, see *United States* v. *Orleans*, 425 U. S. 807 (1976) (not attributable for purposes of tort liability), and suggests that those activities are not undertaken on behalf of the Federal Government, cf. Restatement (Second) of Agency § 14 and Comment *a* (1958) (principal has right to control conduct of agent, and an "agent is subject to a duty not to act contrary to the principal's directions, although the principal has agreed not to give such di-

rections"). Indeed, in different though related contexts this Court has recognized that "[g]rants of federal funds generally do not . . . serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision." *Forsham* v. *Harris*, 445 U. S. 169, 180 (1980); see also *id.*, at 180, n. 11 ("Before characterizing an entity as 'federal' for some purpose, this Court has required a threshold showing of substantial federal supervision of the private activities, and not just the exercise of regulatory authority necessary to assure compliance with the goals of the federal grant"); *United States* v. *Orleans*, *supra*, at 815.

The principle of grantee autonomy is basic to all grant programs, but its significance is greatest in two circumstances especially relevant to these cases. First, grantee autonomy is strongest in "block grant" programs, such as the Housing and Community Development Block Grant program at issue here. In such programs, federal control over the spending of the distributed funds is minimized, and the grant recipient cannot plausibly be said to be acting for anyone but itself. The Federal Government increasingly uses block grants for its grants-in-aid to state and local governments. See 1 R. Cappalli, *supra*, §§ 1.33–1.51 (describing characteristics of block grants and noting major shift toward block grants in 1981); United States Advisory Commission on Intergovernmental Relations, Block Grants: A Comparative Analysis (1977).

Second, the principle of grantee autonomy applies with special force when federal grant recipients are state or local governments. Principles of federalism inherent in our constitutional system have long played a significant role in the congressional creation of federal grant-in-aid programs. See R. Shapek, Managing Federalism: Evolution and Development of the Grant-in-Aid System (1981). Such principles must shape the construction of the statutory language at

issue in these cases. They demand a strong presumption that state and local governments are carrying out their own policies and are acting on their own behalf, not on behalf of the United States, even when their programs are being funded by the United States. A proper respect for the sovereignty of States requires that federal programs not be interpreted to deputize States or their political subdivisions to act on behalf of the United States unless such deputy status is expressly accepted or, where lawful, expressly imposed. It would be inconsistent with the general relationship between the Federal and State Governments to conclude, absent such express actions, that a State is acting in effect as an agent of the United States.

Congress apparently entertained a similar thought when it amended the Grain Standards Act in 1976 to apply § 201 to federally licensed grain inspectors employed by a state agency to exercise federally delegated authority to conduct official inspections of grain. Pub. L. 94–582, § 10, 90 Stat. 2877, 7 U. S. C. § 84(d). If the inspectors had not been state employees, it would have been perfectly apparent—on the authority of *United States* v. *Levine*, 129 F. 2d 745 (CA2 1942), for example—that they were acting on behalf of the United States. See *United States* v. *Kirby*, 587 F. 2d 876, 879–880 (CA7 1978). Congress believed that the federal bribery statute had not previously applied when it enacted the 1976 amendment. See H. R. Rep. No. 94–966, p. 5 (1976); S. Rep. No. 94–747, pp. 9, 17 (1976); S. Conf. Rep. No. 94–1389, p. 47 (1976). The inference seems inescapable that Congress thought it extraordinary, and worth explicit statutory direction, for state employees not actually on detail to the Federal Government to be considered to be acting on behalf of the United States.

Thus, federal grants, especially when the grant recipient is a state or local government, create a distinctive type of relationship between the Federal Government and employees of the grant recipient or its subgrantees. Congress has recog-

nized as much. For the Court to apply the bribery statute to petitioners is to extend the statute to a class of individuals that Congress thinks of as different from that of any others it has intended § 201 to cover and whose relation to the Federal Government raises problems of autonomy and federalism never addressed by Congress in the context of the federal bribery statute. Consequently, with respect to employees of grant recipients or their subgrantees, at least when the grant recipient is a state or local government (as it is in these cases), I do not think that the rule of lenity can be overcome.

Finally, I think it especially inappropriate to construe an ambiguous criminal statute unfavorably to the defendant when the construction that is adopted leaves the statute as unclear in its coverage as the bare statutory language. The rule of lenity rests on the notion that people are entitled to know in advance whether an act they contemplate taking violates a particular criminal statute, even if the act is obviously condemnable and even if it violates other criminal statutes.*

---

*Most if not all States criminally proscribe bribery and acceptance of bribes, though the statutes vary in their definitions of the required relationship of the person bribed to the government. See 12 Am. Jur. 2d, Bribery §§ 1–3, 12–14 (1964 and Supp. 1983). For example, the Illinois bribery statute provides that a person receiving money or property commits bribery if he

"receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee or juror . . . or . . . [h]e solicits any property or personal advantage which he is not authorized by law to accept pursuant to an understanding that he shall influence the performance of any act related to the employment or function of any public officer, public employee or juror." Ill. Rev. Stat., ch. 38, § 33–1 (1977).

It is, of course, a question outside this Court's jurisdiction whether any given state bribery law covers persons, like petitioners, who are employed by an organization that has contracted with a local government to administer funds received by the local government under a federal grant.

The "public trust" standard adopted by the Court provides no more guidance to employees of a grant recipient or its subgrantee than does the statutory language, "acting for or on behalf of the United States." There are hundreds of federal grant programs. See Executive Office of the President, Office of Management and Budget, 1983 Catalog of Federal Domestic Assistance. Yet it is impossible to tell from the Court's analysis just what sorts of federal regulation make a grant recipient subject to the bribery statute. A criminal statute, after if not before it is judicially construed, should have a discernible meaning. I do not think the Court offers one.

I respectfully dissent.