Justice Scalia,
with whom Justice Kennedy and Justice Thomas join, concurring in part and concurring in the judgment.
In my view it is not consistent with the rule of lenity to construe a textually ambiguous penal statute against a criminal defendant on the basis of legislative history. Because Justice Souter’s opinion assumes the contrary, I join only Parts I, II-A, and III, and concur in the judgment.
The Court begins its analysis, quite properly, by examining the language of 18 U. S. C. § 5037(c)(1)(B) — which proves to be ambiguous. Reasonable doubt remains, the Court concludes, as to whether the provision refers (i) to the maximum punishment that could be imposed if the juvenile were being sentenced under the United States Sentencing Guidelines (15-21 months) or (ii) to the maximum punishment authorized by the statute defining the offense, see 18 U. S. C. § 1112(a) (36 months). Ante, at 298. With that conclusion I agree — and that conclusion should end the matter. The rule of lenity, in my view, prescribes the result when a criminal *308 statute is ambiguous: The more lenient interpretation must prevail.
Yet the plurality continues. Armed with its warrant of textual ambiguity, the plurality conducts a search of § 5037’s legislative history to determine whether that clarifies the statute. Happily for this defendant, the plurality’s extratex-tual inquiry is benign: It uncovers evidence that the “better understood” reading of § 5037 is the more lenient one. Ante, at 305. But this methodology contemplates as well a different ending, one in which something said in a Committee Report causes the criminal law to be stricter than the text of the law displays. According to the plurality, “‘[W]e have always reserved [the rule of] lenity for those situations in which a reasonable doubt persists about a statute’s intended scope even after resort to “the language and structure, legislative history, and motivating policies” of the statute.’” Ante, at 305-306 (quoting Moskal v. United States, 498 U. S. 103, 108 (1990) (citation omitted)). I doubt that Moskal accurately characterizes the law in this area, and I am certain that its treatment of “the venerable rule of lenity,” ante, at 305,- does not venerate the important values the old rule serves.
The Moskal formulation of the rule, in approving reliance on a statute’s “motivating policies” (an obscure phrase), seems contrary to our statement in Hughey v. United States, 495 U. S. 411, 422 (1990), that “[e]ven [where] the statutory language ... [is] ambiguous, longstanding principles of lenity . . . preclude our resolution of the ambiguity against [the criminal defendant] on the basis of general declarations of policy in the statute and legislative history.” And insofar as Moskal requires consideration of legislative history at all, it compromises what we have described to be purposes of the lenity rule. “[A] fair warning,” we have said, “should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line *309 should be clear.” McBoyle v. United States, 283 U. S. 25, 27 (1931). “[T]he rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal.” Liparota v. United States, 471 U. S. 419, 427 (1985). It may well be true that in most cases the proposition that the words of the United States Code or the Statutes at Large give adequate notice to the citizen is something of a fiction, see McBoyle, supra, at 27, albeit one required in any system of law; but necessary fiction descends to needless farce when the public is charged even with knowledge of Committee Reports.
MoskaVs mode of analysis also disserves the rule of lenity’s other purpose: assuring that the society, through its representatives, has genuinely called for the punishment to be meted out. “[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.” United States v. Bass, 404 U. S. 336, 348 (1971). See also Liparota, supra, at 427; United States v. Wiltberger, 5 Wheat. 76, 95 (1820). The rule reflects, as the plurality acknowledges, “‘“the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.” ’ ” Ante, at 305 (quoting Bass, supra, at 348, and H. Friendly, Benchmarks 209 (1967)). But legislative history can never provide assurance against that unacceptable result. After all, “[a] statute is a statute,” ante, at 305, n. 5, and no matter how “authoritative” the history may be — even if it is that veritable Rosetta Stone of legislative archaeology, a crystal clear Committee Report — one can never be sure that the legislators who voted for the text of the bill were aware of it. The only thing that was authoritatively adopted for sure was the text of the enactment; the rest is' necessarily speculation. Where it is doubtful whether the text includes the penalty, the penalty ought not be imposed. “[T]he moral condemnation of the community,” Bass, supra, at 348, is no more re- *310 fleeted in the views of a majority of a single committee of congressmen (assuming, of course, they have genuinely considered what their staff has produced) than it is reflected in the views of a majority of an appellate court; we should feel no less concerned about “men languishing in prison” at the direction of the one than of the other.
We have in a number of cases other than Moskal done what the plurality has done here: inquired into legislative history and invoked it to support or at least permit the more lenient reading. But only once, to my knowledge, have we relied on legislative history to “clarify” a statute, explicitly found to be facially ambiguous, against the interest of a criminal defendant. In Dixson v. United States, 465 U. S. 482, 500-501, n. 19 (1984), the Court relied on legislative history to determine that defendants, officers of a corporation responsible for administering federal block grants, were “public officials” within the meaning of 18 U. S. C. § 201(a). The opinion does not trouble to discuss the “fair warning” or “condemnation of the community” implications of its decision, and both of the cases it cites in supposed support of its holding found the statute at hand not to be facially ambiguous. See United States v. Moore, 423 U. S. 122, 131 (1975) (“By its terms § 841 reaches ‘any person’ ” and “does not exempt (as it could have) ‘all registrants’ or ‘all persons registered under this Act’ ”); United States v. Brown, 333 U. S. 18, 22 (1948) (“The legislation reflects an unmistakable intention to provide punishment for escape or attempted escape to be superimposed upon the punishment meted out for previous offenses. This appears from the face of the statute itself”). I think Dixson weak (indeed, utterly unreasoned) foundation for a rule of construction that permits legislative history to satisfy the ancient requirement that criminal statutes speak “plainly and unmistakably,” United States v. Gradwell, 243 U. S. 476, 485 (1917); see also Bass, supra, at 348.
In sum, I would not embrace, as the plurality does, the Moskal formulation of this canon of construction, lest lower *311 courts take the dictum to heart. I would acknowledge the tension in our precedents, the absence of an examination of the consequences of the Moskal mode of analysis, and the consequent conclusion that Moskal may not be good law.