RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0333p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ERICK C. CARTER; WHITNEY A.
HAYES-CARTER; JOSHUA J. GRZECKI,

　　　　　　　　　*Plaintiffs-Appellants*,

UNITED STATES OF AMERICA,

　　　　　　　　　*Intervenor*,

　　*v.*

WELLES-BOWEN REALTY, INC.; WELLES
BOWEN TITLE AGENCY, LLC; WELLES
BOWEN INVESTORS, LLC; WELLES BOWEN
MORTGAGE, INC.; THE DANBERRY CO.;
INTEGRITY TITLE AGENCY OF OHIO &
MICHIGAN, LTD; CHICAGO TITLE INSURANCE
COMPANY; DANBERRY TITLE, LLC,

　　　　　　　　　*Defendants-Appellees*.

No. 10-3922

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
Nos.: 3:05-cv-07427; 3:09-00400—Jack Zouhary, District Judge.

Argued: October 16, 2013

Decided and Filed:  November 27, 2013

Before:  BATCHELDER, Chief Judge; SUTTON, Circuit Judge; BARZILAY, Judge.[*]

_____

**COUNSEL**

**ARGUED:** John T. Murray, MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellants.  Christine N. Kohl, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.  **ON BRIEF:** John T. Murray, MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellants.  Christine N. Kohl, Michael Jay Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.  Richard H. Carr, Maumee, Ohio, for Welles-Bowen Appellees.  Robert J.

_____

[*]The Honorable Judith M. Barzilay, Judge for the United States Court of International Trade, sitting by designation.

Fogarty, Steven A. Goldfarb, Derek E. Diaz, Justin M. Croniser, HAHN LOESER & PARKS LLP, Cleveland, Ohio , for Chicago Title Appellee.  Jay N. Varon, Jennifer Keas, FOLEY & LARDNER LLP, Washington, D.C., Michael D. Leffel, FOLEY & LARDNER LLP, Madison, Wisconsin, Gregory W. Happ, Medina, Ohio, Robert A. Franco, Mansfield, Ohio, Tara Twomey, NATIONAL CONSUMER LAW CENTER, Boston, Massachusetts, for Amici Curiae.

SUTTON, J., delivered the opinion of the court, in which BATCHELDER, C. J., and BARZILAY, J., joined.  SUTTON, J. (pp. 11–21), also delivered a separate concurring opinion.

————————————

**OPINION**

————————————

SUTTON, Circuit Judge.  Under the Real Estate Settlement Procedures Act, a title services company may not pay a real estate agent a fee in exchange for a referral. 12 U.S.C. § 2607(a).   Exempted from this prohibition are "affiliated business arrangements." *Id.* § 2607(c)(4).  The statute establishes three prerequisites for this safe harbor, and everyone agrees that the defendants in this case (several realty companies and title companies) satisfied them.  The plaintiffs (three home buyers) claim that the defendants nevertheless fall outside the safe harbor's coverage because they failed to satisfy a fourth condition announced by the Department of Housing and Urban Development through a policy statement.  As that policy statement is not binding on the Department or anyone else and as it is not otherwise entitled to deference, it does not supplement the Act's existing safe-harbor conditions.  We affirm.

I.

Welles-Bowen is a real estate agency.  It helps people buy homes.  WB Title and Chicago Title are title services companies.  They help people confirm the true ownership of a house before they buy it.

Welles-Bowen, WB and Chicago are related to one another along two dimensions—their ownership and their business.  As for ownership:  The people who own Welles-Bowen also own a holding company that in turn owns about half of WB.

Chicago owns the other half of WB. As for business: Welles-Bowen often refers prospective buyers to WB for title services. WB in turn contracts some of the referred work out to Chicago. In the main Chicago gathers evidence relating to the title, and WB evaluates this evidence to determine the title's validity.

When Erick and Whitney Carter bought a home in 2005, they used Welles-Bowen as their real estate agent. Like other Welles-Bowen clients, they received a referral to WB. And like other WB customers, they saw much of their title work contracted out to Chicago. The Carters did not like this arrangement. To their way of thinking, WB was a shell corporation that funneled referral fees between Chicago and Welles-Bowen. They sued all of the companies under the Real Estate Settlement Procedures Act. Joining the Carters in the lawsuit was Joshua Grzecki, a buyer who raised similar claims against a similar set of companies. The companies responded that they satisfied the Act's safe-harbor requirements and that a policy statement issued by the Department of Housing and Urban Development could not impose a new requirement on them.

The district court sided with the companies, holding the policy statement invalid. After the buyers appealed, the United States intervened to defend the validity of the policy statement.

## II.

### A.

Buying a home involves more than looking at the house, negotiating a price and signing the contract. Before closing the deal, a prudent buyer asks a title agency to check the title for its validity, a pest control company to check the house for termites, an attorney to check the contract for legal errors, and so forth. All of these tasks go by the name of "settlement services." 12 U.S.C. § 2602(3).

The Real Estate Settlement Procedures Act regulates settlement services. Its leading provision prohibits giving or receiving "any fee . . . pursuant to any agreement or understanding . . . that business incident to . . . a real estate settlement service . . . shall

be referred." *Id.* § 2607(a). Anyone who violates the provision commits a crime punishable with up to a year in prison. *Id.* § 2607(d)(1). A violator also faces civil liability through private-enforcement actions as well as through public-enforcement actions. *Id.* § 2607(d)(2), (4). The Department of Housing and Urban Development once administered the enforcement provisions, but legislation passed after this case began transferred this task to the new Consumer Financial Protection Bureau. *Id.* § 2617.

As enacted in 1974, the Act produced uncertainty about its application to referrals between affiliated companies. Suppose a real estate agent refers a client to a title company that the agent owns in part. Consistent with the Act, the agent does not receive a separate fee for making the referral. But the referral gives the title company more business, which in turn increases the title company's profits, which in turn increases the dividends paid to the real estate agent. Does this indirect benefit to the agent constitute a prohibited referral fee?

Congress gave one answer to this question in 1983 when it added a safe harbor for "affiliated business arrangements." *Id.* § 2607(c)(4). The provision covers arrangements in which the person making the referral "has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in" the settlement-service provider receiving the referral. *Id.* § 2602(7). An arrangement qualifies for the safe harbor if it meets three conditions: (1) The person making the referral must disclose the arrangement to the client; (2) the client must remain free to reject the referral; and (3) the person making the referral cannot receive any "thing of value from the arrangement" other than "a return on the ownership interest or franchise relationship." *Id.* § 2607(c)(4). Each of these requirements, but most especially the third, *see* 24 C.F.R. § 3500.15(b)(3)(iii), restricts the use of sham affiliated business arrangements to circumvent the prohibition on referral fees.

B.

The buyers claim that the profits earned by the owners of Welles-Bowen and WB constitute prohibited referral fees due to their relationship with WB.  There is an easy way to look at this claim and a more complicated way to look at it.

The easy way turns on the safe harbor provisions spelled out in § 2607(c)(4). Welles-Bowen's relationship with WB qualifies as an "affiliated business arrangement." The buyers agree that Welles-Bowen had an "affiliate relationship" with WB, that Welles-Bowen made referrals to WB, and that WB in turn provided settlement services. 12 U.S.C. § 2602(7).  This relationship also satisfied the three safe-harbor conditions. Welles-Bowen disclosed the arrangement to the buyers, Welles-Bowen allowed them to reject the referrals, and neither Welles-Bowen nor its owners received anything of value from the arrangement apart from a return on their ownership interests.  *Id.* § 2607(c)(4). Welles-Bowen and WB in short did everything the Act asked of them.  They thus qualify for the affiliated business arrangement exemption.

The more complicated way of looking at the claim must account for the policy statement issued by the Department of Housing and Urban Development in 1996.  *See Statement of Policy 1996-2 Regarding Sham Controlled Business Arrangements*, 61 Fed. Reg. 29,258 (1996).  The statement announced that, despite the three safeguards already contained in § 2607(c)(4), affiliated business arrangements must satisfy a fourth requirement:  "[T]he entity receiving the referrals of settlement service business must be a . . . *bona fide* provider of settlement services."  *Id.* at 29,262.  In addition, the statement continues, "[t]he Department will consider" a series of factors "and will weigh them in light of the specific facts" when separating bona fide providers from shams.  *Id.* The ten factors include whether the provider has "sufficient initial capital and net worth," whether it has "its own employees," and whether it is "located at the same business address as one of the parent providers."  *Id.*  Claiming that the various companies do not satisfy this ten-factor test, the buyers argue that the statutory safe harbor for an affiliated business arrangement does not apply to them.

The short answer to this claim is that a statutory safe harbor is not very safe if a federal agency may add a new requirement to it through a policy statement. The long answer is that the policy statement is not entitled to *Chevron* deference or *Skidmore* consideration, and as a result compliance with the three conditions set out in the statute suffices to obtain the exemption.

Deference under *Chevron v. Natural Resources Defense Council* comes into play only when an agency offers a binding interpretation of a statute that it administers. 467 U.S. 837 (1984). As the government concedes, the policy statement's ten-factor test is not a binding interpretation of the Act. The statement instead informs the public that the Department plans to "consider" these factors when separating bona fide providers from shams. That is another way of saying the statement offers non-binding advice about the agency's enforcement agenda, not a controlling interpretation of the statute. Agency recommendations of this sort, even when cast as policy considerations or preferences, do not bind courts tasked with interpreting a statute.

The government tries to address this problem by claiming that the policy statement contains two parts. The first half, it claims, announces the Department's binding view that only bona fide providers of settlement services qualify for the safe harbor, and the second half presents non-binding advice about how to separate genuine providers from shams. The government claims that the first half of the statement deserves deference even if the second does not.

This theory faces several obstacles. The first is that the statute already contains three conditions that protect buyers against affiliated business arrangements involving sham providers. The bare statement that the safe harbor excludes shams, shorn of the ten-factor test for separating the genuine from the fake, adds nothing to the statute's text. Put another way, why not say that a provider qualifies as "bona fide" under the first half of the policy statement so long as it provides some settlement services, and so long as the arrangement to which it belongs satisfies the criteria laid out in § 2607(c)(4)? That of course is what the statute already does, and the defendants already met these criteria.

But suppose for argument's sake that the first half of the policy statement requires courts to conduct a freestanding inquiry into the provider's genuineness, and that this inquiry has nothing to do with the requirements detailed in § 2607(c)(4). If the ten-factor test does not guide the courts' performance of this task, what does? The government does not say, leaving us to figure out the answer for ourselves. That reality counts against deferring to the policy statement—even just the first half of the policy statement. The point of *Chevron* is to encourage agencies to *resolve* statutory ambiguities, not to create new uncertainties.

Even if the government could overcome this impediment, it would face another obstacle. *United States v. Mead Corp.* holds that an agency interpretation receives *Chevron* deference only if "Congress delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226–27 (2001). Because a policy statement does not speak "with the force of law," the Supreme Court has concluded that "interpretations contained in policy statements . . . do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Even if this is just a norm and not an "absolute rule," *Barnhart v. Walton*, 535 U.S. 212, 222 (2002), the buyers and the government offer no persuasive reason to depart from this norm.

The criminal penalties included in the statute reinforce this application of *Mead*. *See id.* at 222 (characterizing one of the *Mead* totality-of-the-circumstances factors as "the nature of the question at issue"). A single statute with civil and criminal applications receives a single interpretation. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 518 n.10 (1992) (plurality opinion). A bedrock principle of American law requires the government to give the people fair notice of what conduct it has made a crime. *See McBoyle v. United States*, 283 U.S. 25, 27 (1931). Even if we assume that a regulation that authoritatively interprets a statute with criminal applications provides fair warning, *see Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1995), it

is difficult to see how a mere policy statement or opinion letter or agency manual could be up to the task. The government's duty of fair notice precludes us from supplementing the safeguards expressed on the face of the statute with a multi-factor blend that the statute nowhere mentions.

Unable to get help from *Chevron*, the buyers seek refuge in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which entitles an agency's position to weight in proportion to its persuasiveness. Our main reason for denying *Chevron* deference applies equally to *Skidmore*: The policy statement does not present its multifactor test as the agency's interpretation of the Act but only as guidelines that the agency intends to consider.

The government's attempt to divide the policy statement into two halves helps even less here than it did under *Chevron*. Taken by itself, the first half of the statement provides no guidance about how to apply the requirement it seeks to import into the statute. Nor does this part of the statement explain how this imprecision is compatible with the imperative to provide fair warning in the criminal context. These omissions rob the policy statement of persuasive force.

According to the buyers' final and most far reaching argument, the statute, quite apart from any deference owed to the agency's views, implicitly contains the requirement mentioned in the policy statement. The buyers find a textual hook for this argument hidden in a dependent relative clause in the Act's definition section:

> [T]he term "affiliated business arrangement" means an arrangement in which (A) a person who is in a position to refer business incident to or part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership of more than 1 percent in a *provider of settlement services*; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

12 U.S.C. § 2602(7) (emphasis added). According to the buyers, the italicized phrase "provider of settlement services" means "bona fide provider of settlement services," and

whether a provider qualifies as bona fide turns on the factors identified in the policy statement.

We cannot agree. The most natural interpretation of "provider of settlement services" is . . . one who provides settlement services. And the buyers concede that WB provides settlement services.

The structure of the safe harbor supports this interpretation. The Act requires affiliated business arrangements to satisfy three requirements in order to obtain an exemption from the ban on referral fees, *id.* § 2607(c)(4), and proceeds to spell out the requirements in painstaking detail. For example, when the Act requires the person making the referral to disclose the arrangement to the client, it specifies the disclosure's content, timing and mode of delivery, establishing separate rules for face-to-face referrals, referrals in writing, referrals by email and referrals by telephone. *Id.* § 2607(c)(4)(A). The express inclusion of these precise requirements counsels against discovering an additional requirement in the implications of a phrase tucked away in a dependent relative clause elsewhere in the statute. *See Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068, 1076 (2011).

Statutory context fortifies this conclusion. The Act establishes other safe harbors from its ban on referral fees, distinct from the safe harbor for affiliated business arrangements. One of these exceptions protects "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2). The Act thus uses "bona fide" in the salary-or-compensation exception but omits the phrase in the affiliated-business-arrangement exception. This disparity confirms that the latter exception does not call upon courts to conduct a freestanding inquiry into a provider's bona fides unconnected to the safe-harbor test already baked into the statute. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

The buyers respond by claiming that our interpretation frustrates the Act's purpose of prohibiting referral fees. But elastic notions of statutory purpose have diminished value in interpreting a statute as precise and reticulated as the Real Estate

Settlement Procedures Act. The best evidence of legislative purpose usually comes from the four corners of the statute, and that text provides more than adequate evidence of statutory purpose here.

Purpose at any rate is a two-edged sword, and in this instance it furthers our interpretation. Consider the purpose of the safe harbor. As the policy statement itself explains, the statute as first enacted created legal uncertainty about profiting from referrals to affiliated companies. Congress created the affiliated-business-arrangement safe harbor to eliminate this uncertainty. The statute's precision in defining the boundaries of this exception reflects this objective. A multi-factor inquiry that seeks to distinguish bona fide providers from shams in new ways would reintroduce much of the uncertainty the safe harbor meant to eliminate.

In the last analysis, Welles-Bowen's arrangement with WB (and for similar reasons the arrangement between the companies sued by Grzecki) qualifies for the affiliated-business-arrangement exception, as the district court rightly held. Because we have ruled for the defendants on the merits, we need not consider the plaintiffs' challenge to the district court's denial of class certification.

III.

For these reasons, we affirm.

---

**CONCURRENCE**

---

SUTTON, J., concurring.   Anyone who violates the Real Estate Settlement Procedures Act's ban on referral fees commits a crime. *See* 12 U.S.C. § 2607(d)(1).  The rule of lenity tells all interpreters to resolve uncertainties in laws with criminal applications in favor of the defendant.   But the Department of Housing and Urban Development has resolved an ambiguity in the law *against* the defendant, and the government insists that we must defer to this understanding.  The doctrine of *Chevron* deference, the government explains, leaves us no choice.  This theory would allow one administration to criminalize conduct within the scope of the ambiguity, the next administration to decriminalize it, and the third to recriminalize it, all without any direction from Congress.  I am skeptical.

The court does not go into detail in exploring how the rule of lenity interacts with *Chevron* because the issue does not drive the outcome of this case.  But because this question will return sooner or later, I write to offer some thoughts on how to address it when it does.

The rule of lenity tells courts to interpret ambiguous criminal laws in favor of criminal defendants. *United States v. Wiltberger*, 5 Wheat. 76, 95 (1820).  This principle rests on concerns about notice (the state ought to provide fair warning of what violates the criminal laws) and separation of powers (Congress, not agencies or courts, defines crimes). *United States v. Bass*, 404 U.S. 336, 348 (1971).  The *Chevron* doctrine tells courts to defer to an administrative agency's reasonable interpretation of an ambiguous statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  This principle rests on the presumption that, when Congress leaves a statutory gap, it means for the agency rather than the court to fill it. *Id.* at 843–44.

The two rules normally operate comfortably in their own spheres.  The rule of lenity has no role to play in interpreting humdrum regulatory statutes, which contemplate civil rather than criminal enforcement.  And *Chevron* has no role to play in interpreting

ordinary criminal statutes, which are "not administered by any agency but by the courts." *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment); *see Gonzales v. Oregon*, 546 U.S. 243, 264 (2006).

What happens with a hybrid statute? Today's Act imposes civil *and* criminal penalties for violating the provision at issue. *See* 12 U.S.C. § 2607(d). And it empowers an executive agency to administer the provision by making rules and holding hearings. *See id.* § 2617. As between the rule of lenity and the agency's interpretation, which one resolves statutory doubt?

One possibility is to apply the rule of lenity in criminal prosecutions and to defer to the agency's position in civil actions. But a statute is not a chameleon. Its meaning does not change from case to case. A single law should have one meaning, and the "lowest common denominator, as it were, must govern" all of its applications. *Clark v. Martinez*, 543 U.S. 371, 380 (2005).

*United States v. Thompson/Center Arms Co.* illustrates the point. The Court had to interpret a law that included a civil tax penalty and a criminal penalty. Even though *Thompson/Center Arms* was a tax case, the Court applied the rule of lenity. 504 U.S. 505, 518 n.10 (1992) (plurality opinion); *id.* at 519 (Scalia, J., concurring in the judgment). "The rule of lenity," the lead opinion explained, "is a rule of statutory construction[,] . . . not a rule of administration calling for courts to refrain in criminal cases from applying statutory language that would have been held to apply if challenged in civil litigation." *Id.* at 518 n.10 (plurality opinion). Recent cases reaffirm the point. *See, e.g.*, *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *Scheidler v. Nat'l Org. for Women*, 537 U.S. 393, 408–09 (2003).

Case law thus makes clear that either the rule of lenity prevails across the board or the agency's interpretation does. But which one? The better approach, it seems to me, is that a court should not defer to an agency's anti-defendant interpretation of a law backed by criminal penalties.

*First*, the rule of lenity forbids deference to the executive branch's interpretation of a crime-creating law. If an ordinary criminal law contains an uncertainty, every court would agree that it must resolve the uncertainty in the defendant's favor. No judge would think of deferring to the Department of Justice. Allowing prosecutors to fill gaps in criminal laws would "turn the normal construction of criminal statutes upside down, replacing the doctrine of lenity with a doctrine of severity." *Crandon*, 494 U.S. at 178 (Scalia, J., concurring in the judgment).

If the rule of lenity forecloses deference to the Justice Department's interpretation of a crime-creating law in Title 18, does it not follow that it forecloses deference to the Housing Department's interpretation of a crime-creating law in Title 12? Or the immigration authorities' interpretation of a crime-creating law in Title 8? Or the IRS's interpretation of a crime-creating law in Title 26? No principled distinction separates these settings. Allowing housing inspectors and immigration officers and tax collectors to fill gaps in hybrid criminal laws, no less than allowing prosecutors to fill them in pure criminal laws, offends the rule of lenity.

*Second*, looking at the question within the framework of *Chevron* leads to the same answer. An agency's interpretation of a statute does not prevail whenever the face of the statute contains an ambiguity. Deference comes into play only if a statutory ambiguity lingers after deployment of all pertinent interpretive principles. If you believe that *Chevron* has two steps, you would say that the relevant interpretive rule—the rule of lenity—operates during step one. Once the rule resolves an uncertainty at this step, "there [remains], for *Chevron* purposes, no ambiguity . . . for an agency to resolve." *INS v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001). If you believe that *Chevron* has only one step, you would say that *Chevron* requires courts "to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 260 (1991) (Scalia, J., concurring in part and concurring in the judgment). If an interpretive principle resolves a statutory doubt in one direction, an agency may not reasonably resolve it in the opposite direction. *Id.* But the broader point, the critical one, transcends debates about the mechanics of

*Chevron*: Rules of interpretation bind *all* interpreters, administrative agencies included. That means an agency, no less than a court, must interpret a doubtful criminal statute in favor of the defendant.

Precedents in related areas confirm this conclusion. All manner of presumptions, substantive canons and clear-statement rules take precedence over conflicting agency views. *See Wyeth v. Levine*, 555 U.S. 555, 576 (2009) (presumption against preemption); *St. Cyr*, 533 U.S. at 320 (presumption against retroactivity); *id.* (interpretation of doubtful deportation statutes in favor of immigrants); *Alexander v. Sandoval*, 532 U.S. 275, 288–91 (2001) (presumption against implied causes of action); *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (federalism canon); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (avoidance of constitutional doubt). Why treat the rule of lenity, the most venerable and venerated of interpretive principles, differently?

*Third*, the policies that drive lenity and *Chevron* show how to harmonize the two principles. Start with lenity. Making something a crime is serious business. It visits the moral condemnation of the community upon the citizen who engages in the forbidden conduct, and it allows the government to take away his liberty and property. The rule of lenity carries into effect the principle that only the legislature, the most democratic and accountable branch of government, should decide what conduct triggers these consequences. *Bass*, 404 U.S. at 348. By giving unelected commissioners and directors and administrators carte blanche to decide when an ambiguous statute justifies sending people to prison, the government's theory diminishes this ideal.

The rule of lenity also compels the state to give the citizen fair warning, ideally on the face of the statute, of what the criminal law forbids. *McBoyle v. United States*, 283 U.S. 25, 27 (1931). There are no crimes by implication just as no one is killed by implication. Yet if agencies are free to ignore the rule of lenity, the state could make an act a crime in a remote statement issued by an administrative agency. The agency's pronouncement need not even come in a notice-and-comment rule. All kinds of administrative documents, ranging from manuals to opinion letters, sometimes receive

*Chevron* deference.  *See, e.g.*, *Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002).  Nor is this a figment.  In this case, the government has tried to expand a federal criminal law through a policy statement, a theory that runs headlong into "the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should." Henry Friendly, "Mr. Justice Frankfurter and the Reading of Statutes," in *Benchmarks* 196, 209 (1967).

So much for the purpose of lenity; what of the purpose of *Chevron*?  There may be as many accounts of *Chevron* as there are professors of administrative law.  But what matters most, *Chevron*'s account of itself, shows that *Chevron* accommodates rather than trumps the lenity principle.  Filling a statutory gap, the Supreme Court explained, requires making a policy choice.  467 U.S. at 864–65.  But courts should avoid making policy choices, as they enjoy neither expertise in the relevant area nor a democratically accountable pedigree.  *Id.* at 865–66.  Forced to a choice between the two, the Court concluded that administrators are better equipped than judges to fill the gaps.  *Id.* at 866.

This account of *Chevron* says nothing about the present case.  When a court applies the rule of lenity, it does not snatch a policy decision from the political branches. It instead insists that the choice to make the conduct criminal be made by the first political branch rather than the second.  Put another way, *Chevron* describes how judges and administrators divide power.  But power to define crimes is not theirs to divide.  The accommodation then becomes straightforward:  Allowing agencies to fill gaps in criminal statutes would impair the rule of lenity's purposes, and interpreting these statutes leniently would respect *Chevron*'s aims.

*Fourth*, uninvited oddities arise if courts but not agencies must adhere to the rule of lenity.  *United States v. Mead Corp.*, 533 U.S. 218 (2001), and its follow-on cases hold that an agency interpretation's eligibility for *Chevron* deference depends on the procedure that preceded the interpretation's adoption as well as on factors like "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a

long period of time." *Walton*, 535 U.S. at 222. Where the governing statute creates only civil liability, a multi-factor test may be the best one can hope for. *See Mead*, 533 U.S. at 236–37. But it is a bit strange to say that, if Welles-Bowen wants to know whether it commits a *crime* by falling afoul of a policy statement, it must first endure the "open-ended rough-and-tumble of factors." *Medellin v. Texas*, 552 U.S. 491, 514 (2008).

*Auer v. Robbins*, 519 U.S. 452 (1997), adds another complication. It says that, when a regulation interpreting an ambiguous statute itself contains an ambiguity, the agency's interpretation of the regulation receives essentially complete deference. *See id.* at 461; *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Unless the rule of lenity applies to agencies, *Auer* would give each agency *two* ways of construing criminal laws against the defendant—by resolving ambiguities in the criminal statute and by resolving ambiguities in any regulation. What's more, the range of documents eligible for deference under *Auer* is broader than under *Chevron*. Even an interpretation contained in a brief may receive deference. *Auer*, 519 U.S. at 462. One head-turning upshot of permitting *Chevron* to silence the rule of lenity is this: Any government lawyer with a laptop could create a new federal crime by adding a footnote to a friend-of-the-court brief. That is not likely.

The retroactivity of *Chevron* deference adds another paradox. An agency's authoritative interpretation of a statute attracts deference even in cases about transactions that occurred before the issuance of the interpretation. *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 n.3 (1996). But how would this rule work in a criminal setting given the Ex Post Facto Clause? *See* U.S. Const. art. I, § 9, cl. 3. So long as the one-statute, one-interpretation rule stands, a court cannot dignify the one principle without slighting the other.

The government, both in this case and in similar cases before other courts, offers several lines of argument in response to this approach. None is convincing.

The government points out that several cases show that Congress's authority to define crimes is not exclusive. Although the Constitution as a general matter vests power to define crimes in Congress alone, the modern nondelegation doctrine, it is true,

occasionally allows Congress to transfer some responsibility for defining crimes to the executive branch.  Hence *United States v. Grimaud*, 220 U.S. 506 (1911), held that Congress could make it a crime to violate regulations issued by the Secretary of Agriculture.  *Touby v. United States*, 500 U.S. 160 (1991), held that Congress could direct the Attorney General on an emergency basis to figure out which drugs to classify as controlled substances.  And *United States v. O'Hagan*, 521 U.S. 642 (1997), saw nothing objectionable in a law authorizing the Securities and Exchange Commission to make rules combating securities fraud and to make violations of these rules crimes.  If the Court allowed Congress to assign responsibility for defining crimes to the executive in those cases, what makes today's case different?

The argument overlooks the reality that, if Congress wants to assign the executive branch discretion to define criminal conduct, it must speak "distinctly." *Grimaud*, 220 U.S. at 519; *United States v. Eaton*, 144 U.S. 677, 688 (1892).  This clear-statement rule reinforces horizontal separation of powers in the same way that *Gregory v. Ashcroft*, 501 U.S. 452 (1991), reinforces vertical separation of powers.  It compels Congress to legislate deliberately and explicitly before departing from the Constitution's traditional distribution of authority.  Cases like *Grimaud*, *Touby* and *O'Hagan* respected this express-statement requirement, but the government's theory flouts it.  Under the government's approach, courts could *presume* a congressional delegation of authority to create crimes whenever a criminal statute contains a gap.  A presumption does not a clear statement make.

A related analogy to the Court's federalism precedents fortifies the point.  The Constitution sometimes allows Congress to upset federalism norms provided it legislates clearly.  *See Gregory*, 501 U.S. at 460.  But it does not follow that *Chevron* allows agencies to upset federalism norms when Congress legislates ambiguously.  *See SWANCC*, 531 U.S. at 172–73.  In the same way, Congress may sometimes depart from separation-of-powers principles so long as it legislates clearly.  But it does not follow that agencies may depart from separation-of-powers principles when Congress legislates ambiguously.

Quite apart from the clear-statement rule, the Constitution may well also require Congress to state more than an "intelligible principle" when leaving the definition of crime to the executive. The Supreme Court has suggested that "greater congressional specificity [may be] required in the criminal context." *Touby*, 500 U.S. at 166; *see Yakus v. United States*, 321 U.S. 414, 423–27 (1944). The laws at issue in *Grimaud*, *Touby* and *O'Hagan* honored this principle. But under the government's approach, an agency could fill a gap in a criminal statute even where Congress provides no specific guidance about how to fill it.

The government separately relies heavily on a footnote in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*. 515 U.S. 687, 704 n.18 (1995). *Sweet Home* arose under the Endangered Species Act, which made it an offense (subject to civil and criminal penalties) to "take" any endangered species. 16 U.S.C. § 1538(a)(1). The Interior Department issued a regulation interpreting this provision to prohibit "significant habitat modification or degradation" that kills or injures protected wildlife. 50 C.F.R. § 17.3 (1994). Before the agency could enforce this regulation, landowners challenged it on its face, claiming that it outstripped the agency's statutory authority.

Citing *Chevron*, the Court gave the interpretation contained in the regulation "some degree of deference." *Sweet Home*, 515 U.S. at 703. The Court then dropped this footnote:

> Respondents also argue that the rule of lenity should foreclose any deference to the Secretary's interpretation . . . because the statute includes criminal penalties. . . . We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute . . . where no regulation was present. *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–18 & n. 9 (1992). We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement. Even if there exist regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity, the [present] regulation, which has existed for two decades and gives a fair warning of its consequences, cannot be one of them.

*Id*. at 704 n.18. As the government reads it, this passage definitively holds that *Chevron* deference defeats the rule of lenity.

That is a lot to ask of a footnote, more it seems to me than these four sentences can reasonably demand. Note first of all that the government's reading eclipses the just-mentioned *Grimaud/Eaton* line of cases, which hold that, if Congress wants to assign responsibility for crime definition to the executive, it must speak clearly. No one thinks that *Chevron*-triggering ambiguity satisfies a clear-statement requirement. Did the Court mean to overrule these precedents in a footnote that does not even mention them? Not likely. And a case decided after *Sweet Home* expressly declines—in a footnote, no less—to decide how the rule of lenity and *Chevron* interact. *See SWANCC*, 531 U.S. at 174 n.8. Why did the Court express reluctance to decide a question if, as the government claims, it had already decided it?

The answer is that *Sweet Home's* footnote 18 lends itself to a narrower reading, one that preserves the clear-statement rule applicable in this setting and one that preserves the obligation of courts *and* agencies to respect the rule of lenity. The footnote merely acknowledges the possibility of a pre-enforcement facial challenge to an agency's regulation—because the agency had no interpretive authority in the first place, because the agency failed to follow the procedures for promulgating the regulation or because the statute plainly forecloses the agency's interpretation. Yet not one of these challenges depends on, or demands consideration of, the rule of lenity. Why else would the Court distinguish cases involving "specific factual dispute[s]" from cases "reviewing facial challenges"? What purpose could this distinction serve unless the Court meant to create a rule for facial challenges? Although the footnote mentions that the Interior Department's two-decade-old regulation comports with one of the rule of lenity's objectives (promoting fair notice), it says nothing about other regulations or the rule lenity's separation-of-powers objective (reinforcing that Congress, not courts or agencies, define crimes). Before accepting the government's broad reading of the footnote, one would have expected the Court to say more before allowing agencies to

trump a doctrine Chief Justice Marshall described as "perhaps not much less old than construction itself."  5 Wheat. at 95.

Not only does the age of the rule counsel against sweeping it aside sotto voce in a footnote, but so does its growing significance in interpretive disputes about the meaning of criminal laws.  The Court has all but abandoned the practice of interpreting criminal laws against defendants on the basis of legislative history.  *Compare, e.g.*, *United States v. Santos*, 553 U.S. 507, 513 n.3 (2008) (plurality opinion), *with, e.g.*, *Dixson v. United States*, 465 U.S. 482, 491 (1984); *see United States v. R.L.C.*, 503 U.S. 291, 307–11 (Scalia, J., concurring in the judgment).  And it has found lenity-triggering ambiguity in criminal laws more readily of late than it did in the past.  *Compare, e.g.*, *Santos*, 553 U.S. at 513–14, *with, e.g.*, *Moskal v. United States*, 498 U.S. 103, 108 (1990).  Meanwhile, deference has shrunk in reach.  The Court has cabined the range of materials entitled to *Chevron* deference.  *See, e.g.*, *Mead*, 533 U.S. at 231.  And it has confirmed that *Chevron* does not permit an agency to trump other rules of interpretation. *See, e.g.*, *St. Cyr*, 533 U.S. at 320 n.45.  Lenity and *Chevron* thus look different now than they did when *Sweet Home* inscrutably footnoted their interaction.

If accepted, moreover, the government's theory would mean that, in many of the Court's criminal cases, criminal defendants were one agency interpretation away from being incarcerated.  It would mean that ambiguity in the Fair Labor Standards Act would have allowed the Secretary of Labor to decide that an employer commits a new crime not just when he sets an employee's salary too low but each week he underpays the employee. *But see United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218 (1952). It would mean that ambiguity in the National Firearms Act would have allowed the Secretary of the Treasury to decide that a gun manufacturer commits a crime when it packages a pistol with a carbine-conversion kit.  *But see United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992).  It would mean that ambiguity in the Immigration and Nationality Act would have allowed the Attorney General to decide that drunk driving is a crime of violence. *But see Leocal v. Ashcroft*, 543 U.S. 1 (2004).  And it would mean that ambiguity in the Immigration and Nationality Act would have

allowed the Attorney General to decide that first-time drug possession and social sharing of marijuana are drug-trafficking crimes.  *But see Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010); *Moncrieffe v. Holder*, 133 S. Ct. 1678 (2013).

In the final analysis, the government's theory gives the executive branch an *implied* share of the legislature's power to define crimes.  That is no small matter given "the growing power of the administrative state," *City of Arlington v. FCC*, 133 S. Ct. 1863, 1879 (2013) (Roberts, C.J., dissenting), and it is no small matter given the reality that Congress continues to "put[] forth an ever-increasing volume . . . of criminal laws," *Sykes v. United States*, 131 S. Ct. 2267, 2288 (2011) (Scalia, J., dissenting).  None of the Supreme Court's decisions requires us to accept this theory; many stand in its way. Agencies, no less than courts, must honor the rule of lenity.